**SYNTEX LABORATORIES, INC.,**
Plaintiff,

v.

The **NORWICH PHARMACAL COM-
PANY, Defendant.**

No. 69 Civ. 4687.

United States District Court,
S. D. New York.

June 30, 1970.

———◆———

Weil, Lee & Bergin, New York City, for plaintiff; Alfred T. Lee, New York City, of counsel.

Bradford S. Allen, Norwich, N. Y., for defendant.

MANSFIELD, District Judge.

In this trademark infringement suit brought by the owner of the mark Vagitrol to prevent defendant's use of the mark Vagestrol on a similar prescription drug, plaintiff has moved for summary judgment or, in the alternative, for preliminary injunctive relief pending trial of its claims. Defendant's prior motion to change venue to the Northern District of New York, filed with its answer, is now countered by plaintiff's additional motion for a change of venue to the Central District of California. Plaintiff's motion for preliminary injunctive relief is granted. Its motion for summary judgment and the motions for a change of venue are denied.

Plaintiff's mark Vagitrol was originally adopted in early 1963 by Provident Pharmaceuticals, Inc., a Tennessee corporation, for use on a sulfanilamide prescription drug in cream form intended for the treatment of various vaginal infections (e. g., bacterial vaginitis and cervicitis) by internal application in the vaginal tract. Pursuant to an application filed on September 23, 1963, the Patent Office issued Registration No. 770,263 to Provident Pharmaceuticals on May 26, 1964, for such use of the Vagitrol mark.

During the year 1964 Provident was merged into Reid-Provident Laboratories, Inc., a Georgia corporation, to which it assigned all rights in the Vagitrol mark. Reid-Provident thereafter continued production of the Vagitrol product in modest quantities for distribution and sale primarily in a 12-state area in the southeastern part of the country, achieving a sales volume of $61,068 during the period 1968–69.

In early 1969 plaintiff Syntex Laboratories, a national drug manufacturer incorporated in Delaware with principal offices in Palo Alto, California, entered into negotiations with Reid-Provident for the purchase of the Vagitrol product and registered trademark. These negotiations culminated in an assignment of all rights in the mark and product to Syntex on April 10, 1969, subject to certain limited rights in Reid-Provident to continue manufacture and to sell off its inventory of the product during the transition period before Syntex began actual manufacture and distribution of the Vagitrol cream. Syntex commenced shipping the product to the drug trade on September 23, 1969, and is currently distributing and promoting sales of Vagitrol cream on a nationwide basis.

Sometime in the latter part of 1968, the Eaton division of defendant Norwich Pharmacal Company, a national drug manufacturer incorporated in Delaware with principal offices in Norwich, New York, began consideration of a trademark for use on a form of suppository to be used for the treatment of atrophic vaginitis through replenishment of the diethylstilbestrol estrogen, or female hormone. A preliminary search of the current pharmaceutical reference books revealed plaintiff's mark Vagitrol, as

well as a number of other marks employing the "vag-" prefix. After a subsequent, more formal trademark search had been completed, the word Vagestrol was adopted by Eaton for use on its suppositories on January 24, 1969, by a shipment in interstate commerce to physicians conducting clinical investigations of the product.

On March 17, 1969, Eaton filed an application for registration of the word Vagestrol for use on "an ethical pharmaceutical estrogen suppository for vaginal use." Three months later, on June 17, the Patent Office refused registration of the word on grounds of a confusing resemblance to plaintiff's Vagitrol mark. Eaton promptly responded, setting forth its arguments for concurrent registration of the Vagestrol and Vagitrol marks, and continued with its plans to market the Vagestrol suppositories. National promotion, advertising and distribution of the product were initiated on September 2, 1969.

Eight days after the filing of Eaton's application for registration of the Vagestrol mark, on March 25, 1969, Reid-Provident wrote to Eaton pointing out its own registration of the Vagitrol mark and requesting Eaton to refrain from further use of the word Vagestrol. Eaton replied that the products were different, and that the connotations and pronunciation of the two names (it being claimed that Vagitrol was accented on the first syllable and Vagestrol on the second) were sufficiently distinct to obviate any danger of confusion between them. Continued correspondence, first with Reid-Provident and later with Syntex, failed to persuade defendant to forego use of the Vagestrol mark, and following defendant's national marketing of the Vagestrol product plaintiff filed this suit on October 27, 1969. Defendant thereupon requested the Patent Office to suspend further consideration of its application for registration of the Vagestrol mark, pending judicial resolution of this litigation.

Plaintiff's contention is that the similarities between the Vagitrol and Vagestrol marks are such that, when the words are used in connection with products intended for such closely similar purposes, it is likely that confusion and mistake will result among prescribing physicians, dispensing pharmacists and members of the public. Such confusion, it argues, is an infringement of its commercial rights in the Vagitrol mark and, in the context of potent prescription drugs with different active ingredients, dangerous to the public as well. Defendant denies any real likelihood of confusion, and contends that in any case the purported assignment of the Vagitrol mark to Syntex on April 10, 1969, is of no effect, rendering Syntex the junior user if any likelihood of confusion should be found.

Counsel for both sides have furnished us with extensive undisputed documentary proof and lengthy briefs of unusual quality and thoroughness, which we have carefully reviewed. Were it not for the disfavor with which this Circuit has viewed summary judgment in trademarks suits, see the oft-cited comment in Marcus Brier Sons Inc. v. Marvlo Fabrics Inc., 173 F.2d 29 (2d Cir. 1949), that "Disputes between parties as to trade-mark validity and infringement can rarely be determined satisfactorily on a motion for summary judgment," we would be inclined to grant such relief here. No genuine issue as to a material fact is raised, with the possible exception of the issue of confusion, as to which defendant has furnished unsupported, conclusory medical opinions to the effect that prescriptions for defendant's product Vagestrol would always contain sufficient information to distinguish it from plaintiff's product Vagitrol. Under the stringent standard by which we are governed under Rule 56, F.R.Civ.P., this meager offering probably precludes summary judgment. However, it would not necessarily call for denial of preliminary injunctive relief. From our examination of all of the evidence submitted we are convinced that there is a very strong likelihood that plaintiff will prevail on the merits. Ac-

cordingly, after weighing the balance of hardships, including the serious injury that might be caused to the public if such relief were denied, we believe that this presents an appropriate case for the issuance of preliminary injunctive relief in the exercise of our discretion.

*Infringement—Likelihood of Confusion*

■ "Confusion as to source of origin is * * * the keystone of an action based upon infringement of a registered mark. 15 U.S.C.A. § 1114(1)." Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 612 (2d Cir.), cert. denied, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960). In a garden-variety trademark infringement suit, where the chief interest affected by the alleged infringement is the plaintiff's economic interest in preventing others from trading on its name and good will, the confusion question reduces to whether there is a likelihood that an appreciable number of ordinary prudent purchasers of the defendant's product may, by reason of its labelling with the allegedly infringing mark, be misled into believing that the product comes from the same source as plaintiff's goods. Avon Shoe Co. v. David Crystal, Inc., *supra* at 612; Haig v. Haig, Inc. v. Maradel Products, Inc., 249 F.Supp. 575, 577 (S.D.N.Y.1966).

■ Confusion on the part of "ordinary prudent purchasers" is not, however, the only form of confusion relevant in trademark infringement litigation. Title 15 U.S.C. § 1114(1) provides a remedy for trademark infringement against

"[a]ny person who shall, without the consent of the registrant—

"(a) use in commerce any * * * colorable imitation of a registered mark in connection with the sale * * * of any goods * * * on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. * * *"

Here the products in question are prescription drugs, chosen by physicians and dispensed upon their prescriptions by pharmacists. Except for the remote possibility of confusion on the part of a patient who has a quantity of both products, prescribing physicians and dispensing pharmacists constitute the class within which confusion between plaintiff's and defendant's products is of concern to us. A. Seidel, S. Dubroff & E. Gonda, Trademark Law and Practice ¶16.08 at 424 (1963).

■ The factors to be considered in deciding whether or not one mark infringes trademark rights in another "are variable and relative and no single one, because of its presence or absence, is, in itself, determinative of a case." Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., 411 F.2d 1097, 1099 (2d Cir. 1969). See also Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Among the relevant considerations are the proximity of the products, the similarity of the marks, the sophistication of affected consumers, the strength of the plaintiff's mark, evidence of actual confusion, the quality of defendant's product, and the defendant's good faith or lack thereof in adopting the allegedly infringing mark. Polaroid Corp. v. Polarad Electronics Corp., *supra* at 495.

Here while the two products are different in form (plaintiff's Vagitrol being a cream and defendant's Vagestrol a suppository), different in composition (the one with sulfanilamide, the other with the diethylstilbestrol estrogen (female hormone) as its active ingredient), and intended for the treatment of medically distinct conditions (bacterial and atrophic vaginitis respectively), the uses of the two products are closely parallel. Bacterial and atrophic vaginitis, though differently named, are so similar in symptoms that an internal examination by a qualified physician is necessary to discriminate between them. Until recently, in fact, defendant manufactured a product called Furestrol which combined the estrogenic replenishment and anti-bacterial properties of the two products before us in a single prepara-

tion. Thus the products in question here, while not directly competitive, are likely to be closely associated in the minds of those who prescribe and dispense them.

■ Having in mind that the test is resemblance rather than identity, ALI Restatement, Torts, § 728, comment (b), the similarity of the marks Vagitrol and Vagestrol is striking. The detailed phonetic and visual analysis to which both parties have subjected the two words adds very little to what common sense suggests. While physicians and especially gynecologists are probably more sensitive than laymen to certain connotations of defendant's mark because of their familiarity with estrogenic substances and their medical uses, there is no guarantee that they will accent the word Vagitrol on the first syllable rather than the second, Vagestrol on the second syllable rather than on the first, or that if they do the likelihood of confusion between the two marks will be obviated. Similarly there is no guarantee that the letters "es" will automatically imply the use of estrogens when followed by "trol," which usually signifies "control" of bacteria, the function of Vagitrol. Furthermore, prescriptions are commonly both telephoned and written. If both Vagitrol and Vagestrol are accented on the first syllable, the words could easily be confused when spoken; even if accented as they should be they could easily be confused when written, particularly when written in the characteristically illegible scrawl of the prescribing physician. The illegibility with which some physicians scrawl a pre-

scription is evidenced by some 50 samples submitted as an exhibit. The danger of confusion is further shown by the frequent publication in widely-distributed medical journals of lists of similar-appearing or similar-sounding prescription drugs.

Although prescriptions usually include quantities and dosages, which may help to distinguish between a suppository product and a cream, they normally say nothing more about dosage than "as directed," relegating the patient to the detailed instructions printed on the outside of the packaged product. Since both plaintiff's and defendant's products, respectively, are sold in sealed cartons bearing specific directions for use in treatment of the vaginal tract, it appears unlikely that the patient would catch a mistake made on the part of the pharmacist in filling a prescription with one product rather than the other. Furthermore, in spite of defendant's arguments to the contrary, plaintiff is entitled to protection of its right to manufacture and market a suppository form of its Vagitrol product.[1] While prescriptions for Vagestrol suppositories and Vagitrol cream might be differentiated by the quantity term of the prescription, prescriptions for suppositories alone under the two names could not. In the latter case only the names would be distinctive. Although pharmacists may make a practice of checking with the prescribing physician to clarify illegible prescriptions, with names so close it is quite possible that when handwritten one might be unhesitatingly misread for the other.

1. "[T]he protection to which the owner of a trademark is entitled extends to products which would be reasonably thought by the buying public to come from the same source if sold under the same mark, and also extends to other products if those products are fairly within the normal field of expansion of the business."
Robinson Co. v. Plastics Research & Development Corp., 264 F.Supp. 852, 862 (W.D.Ark.1967). See also Colonial Radio Corporation v. Colonial Television Corp., 78 F.Supp. 546 (S.D.N.Y.1948).

As for what the expectations of the buying public and the "normal field of expansion of the business" may be in this case, it is sufficient to note that the National Drug Company, which manufactures AVC cream (the chief competitor of Vagitrol cream) offers the same product in a suppository form as well. Syntex has in fact developed a tablet form of Vagitrol suppository (Walter Dep. at 14); whether developmental work began after the commencement of this suit, as defendant suggests, is irrelevant to the question before us.

Such considerations are, of course, addressed chiefly to the problem of confusion on the part of the dispensing pharmacist and the patient. There is also the problem of the pharmacist who accurately fills a clear prescription for the wrong drug because of confusion on the part of the prescribing physician. It is true that the medical significance of the "estrol" portion of defendant's mark would tend to minimize confusion between the products on the part of doctors. Nevertheless, given two drugs intended for the treatment of such closely related conditions, with names of strong visual and phonetic resemblance, it would hardly be surprising if the wrong one were occasionally prescribed by oversight, quite apart from the possibility that the two might be taken for the same drug in different forms.

We are well aware that the physicians and pharmacists whose potential confusion concerns us are specialists, accustomed to dealing with potent drugs, sensitive to distinctions and differences that would not strike the ordinary man as significant, and accustomed to taking precautions commensurate with the potential consequences of error in their work. They are a sophisticated class of consumers, and our estimate of any "likelihood of confusion" must take this into account. Nevertheless we cannot assume that they are immune from error, or gifted with endless powers of discrimination between medically related and almost identically named products. Without appealing to the specter of the foreign-born physician with little fluency in the English language who prescribes medication while exhausted from a night of delivering children at numerous hospitals and desperately seeking to recall the correct name of the drug intended to be prescribed for the vaginal tract (see Def's brief at 9), it may reasonably be inferred from common experience generally that many prescriptions are written hurriedly by doctors required to select from a wide variety of drugs and preparations without necessarily having acquired or retained detailed knowledge as to the distinctions between those bearing virtually identical names.

Turning next to the factor of strength of the mark for which protection is sought, plaintiff's mark is not as "strong" as certain fabricated marks such as Kodak, Kiki or Poloroid, which are entirely without significance except as denoting a single source or origin of the goods to which they are attached. Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531, 536 (2d Cir. 1964). The "vag" prefix is strongly suggestive, if not descriptive, on a vaginal drug product, particularly in light of well over a dozen other such drugs currently available whose names begin the same way.[2] Similarly the "trol" suffix is suggestive of the bacterial con*trol* which is the objective of the product, and is not an unusual termination for a drug name.[3] When joined together to form the word Vagitrol, however, the suggestiveness of these individual elements is somewhat attenuated.

The strength or weakness of a trademark is ordinarily of importance as a factor to be considered in determining the closeness of the association, in the mind of the consumer, between the mark and the product or manufacturer to which it attaches. When the central interest in the case is the plaintiff's economic interest in protecting that association from dilution by the defendant's allegedly infringing use, a weak mark will be given less consideration than a strong one because the association of name and product is already attenuated to some degree by the presence of referents and connotations extraneous to the

---

2. E. g., Vagacream, Vagarest, Vagex, Vagicide, Vagicosa, Vagicream, Vagicup, Vagi-Medi-Sul, Vaginettes, Vaginolia, Vagi-Plex, Vagisan, Vagisept, Vagiseptine, Vagotab, Vagsertabs and Vag Sol.

3. There are 88 current registrations for medical product trademarks having a "trol" suffix. (Palik Aff. at 2).

mark-product link. Where, however, there is in addition a public interest in avoiding confusion between the plaintiff's and defendant's products, as in the present case, the strength of the plaintiff's mark is reduced in importance. Confusion between products, not manufacturers, then becomes of primary importance, and trademark strength relates only indirectly to that kind of confusion.

No evidence of actual confusion between Vagitrol and Vagestrol on the part of either doctors or pharmacists has been presented. In light of the limited period during which the two products have been nationally available, however, we are unwilling to accept defendant's contention that no such confusion exists.

> "Actual confusion or deception of purchasers is not essential to a finding of trademark infringement or unfair competition, it being recognized that 'reliable evidence of actual instances of confusion is practically almost impossible to secure.'" (Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755, 761 (2d Cir. 1960))

Furthermore, memoranda from members of defendant's sales and promotional force reveal their opinion that the two names were confusingly similar (see Plf's main brief at 8, 15, 33–34).

There is no challenge to the quality of defendant's product. Defendant is an established manufacturer of pharmaceuticals in a closely regulated industry, and plaintiff does not contend that use of the Vagestrol mark on defendant's suppositories has in any way harmed, or will harm, its own or its product's reputation, except to the extent that fear of confusion of names on the part of a pharmacist might deter a physician from prescribing Vagitrol.

Finally, we must examine the good faith or lack thereof with which defendant adopted the Vagestrol mark. It is undisputed that defendant was aware from the very beginning of its search for a trade name for its suppositories that plaintiff had registered the mark Vagitrol and that it would vigorously contest defendant's choice of the word Vagestrol. Furthermore, at a relatively early stage defendant was made aware of the Patent Office's view that the mark it had chosen was confusingly similar to plaintiff's registered mark. However, in the absence of evidence that defendant was trying to obtain a "free ride" on the good will attaching to plaintiff's product, we cannot characterize defendant's behavior as wilfully tortious. What it amounted to was a conscious decision to take the risk of coming very close to infringement, for the sake of a trade name defendant evidently believed would be more valuable to it than any of the available alternatives. While a preliminary Patent Office determination is not binding upon either this court or a trademark applicant, it is entitled to "substantial weight" on the part of both. W. E. Bassett Co. v. Revlon, Inc., 305 F. Supp. 581, 588 (S.D.N.Y.1969) (Frankel, J.) and cases there cited; Kiki Undies Corp. v. Promenade Hosiery Mills Inc., 411 F.2d 1097, 1101 (2d Cir. 1969). Assuming (as we find below), that plaintiff is a bona fide senior user of the Vagitrol mark, defendant does not, therefore, qualify as an "innocent junior user" as that status is defined in the Avon Shoe case and in Triumph Hosiery Mills Inc. v. Triumph International Corp., 308 F.2d 196 (2d Cir. 1962). Unlike the situation in Triumph, the completeness of its knowledge at the time of its adoption of the Vagestrol mark outweighs its belief that its conduct was not tortious.

The issue is not whether plaintiff's and defendant's prescription drugs can be told apart, or even whether they usually would be told apart, but whether there is a likelihood that, because of the similarlity of the names attached to them, they might not be told apart. We are not here concerned with ordinary consumer goods (e. g., sportswear or after-shave lotion) where the test is one of a substantial likelihood of confusion on the part of an "appreciable number" of purchasers, which might cause eco-

nomic loss to the lawful trademark owner. See Avon Shoe Co. v. David Crystal, Inc., *supra*; Haig & Haig, Inc. v. Maradel Products, Inc., *supra*. Here we are concerned primarily with public health, not profits. The result of confusion could be physical injury to members of the consuming public, whether through simple failure to receive effective medication or through adverse reaction to inadvertently prescribed or dispensed drugs. As defendant's own promotional material indicates, because estrogens can aggravate cancerous conditions in certain individuals, Vagestrol is contraindicated for individuals with either a personal or family history of breast or genital malignancy.[4] Similarly the sulfanilamide ingredient of Vagitrol can produce allergic reactions in those sensitive to sulfa drugs.[5] In addition the significance of side effects such as skin rash (indicative of an underlying systemic toxicity) may be ignored by the physician and by the patient who has not been warned to watch for it.

There is thus a public interest in avoiding confusion between plaintiff's and defendant's products above and beyond the economic interest normally present in infringement cases. With the consequences of confusion so much more serious, relief should be granted upon lesser proof of confusing similarity in a prescription drug case than in other areas of infringement litigation. Morgenstern Chemical Co. v. G. D. Searle & Co., 253 F.2d 390 (3d Cir. 1958). See also Eli Lilly & Co. v. Burlington Pharmacal, Inc., 161 U.S.P.Q. 370, 373 (P.O. T.M.T.App.Bd.1969); Dietene Co. v. Dietrim Co., 225 F.2d 239, 243 (8th Cir. 1955); Campbell Prods. Inc. v. John Wyeth & Bros., 62 U.S.P.Q. 302, 304 (C.C.P.A.1944). Defendant urges that the *Morgenstern* rule has been followed only in trademark registration decisions by the Patent Office trials and appeals board, and that the Second Circuit applies the same standard to drug products that it does to any other trademark in commerce, citing Upjohn Co. v.

---

4. The Physicians' Desk Reference (23d ed. 1969), in describing certain diethylstilbestrol products, states at p. 819:
 "Contraindications: The contraindications to diethylstilbestrol administration are the same as to estrogen therapy in general. Estrogens should not be administered in the absence of a positive indication, and they should be avoided in premenopausal women with carcinoma of the breast and in all women with genital malignancy. A family history of a high incidence of breast or genital malignancy may be a contraindication.
 "In young patients in whom bone growth is not complete, estrogen therapy is contraindicated because of its effect on epiphyseal closure.
 "Suspected or known hepatic disease should be regarded as a contraindication to prolonged estrogen therapy.
 "Warning: Because of possible adverse reaction on the fetus, the risk of estrogen therapy should be weighed against the possible benefits when diethylstilbestrol is considered for use in a known pregnancy.
 "Precautions: Diethylstilbestrol is a potent drug, and caution must be employed in its use. Indiscriminate or injudicious administration may be dan-

gerous. Patients receiving the drug should be under continuous medical supervision. In women, the breasts and pelvic organs should be examined before treatment is begun and at intervals during therapy.
 "Diethylstilbestrol should be administered with caution to a patient with bone, renal, or other disease involving calcium or phosphorus metabolism, since estrogens are known to affect metabolism of these substances. Conditions such as epilepsy, migraine, asthma, and cardiac or renal dysfunction require careful observation because the drug may produce some degree of fluid retention. Liver, thyroid, or adrenal function tests should not be performed until estrogen therapy has been discontinued for two months."

5. Plaintiff's packaging of its Vagitrol product includes the following:
 "WARNINGS AND PRECAUTIONS: The usual precautions concerning topical sulfonamide therapy should be observed. Vagitrol should not be used in patients known to be sensitive to sulfonamides. If skin rash or other evidence of systemic toxicity occur, the medication should be discontinued."

Schwartz, 246 F.2d 254 (2d Cir. 1957). However, the *Upjohn* case is not in point here; it involved cherry flavored cough medicines which, while "sometimes sold pursuant to a memorandum prescription," could, under the law, be dispensed without a prescription. Both cough medicines were made from the same formula with precisely the same ingredients, so that no harm other than lost sales to the plaintiff could result from confusion between the two. Defendant has cited no cases from this Circuit, or indeed from any other, where a conventional confusion-as-to-source-of-origin test for infringement has been applied to facts similar to those before us. Both logic and sound policy support the Third Circuit's approach to drug trademark infringement litigation in *Morgenstern*:

> "In the field of medical products, it is particularly important that great care be taken to prevent any possibility of confusion in the use of trade-marks. * * * The defendant concedes that physicians and pharmacists are not infallible but urges that the members of these professions are carefully trained to detect differences in the characteristics of pharmceutical products. While this is doubtless true it does not open the door to the adoption by manufacturers of medicines of trademarks or names which would be confusingly similar to anyone not exercising such great care. For physicians and pharmacists are human and in common with the rest of mankind are subject to human frailities. In the field of medicinal remedies the courts may not speculate as to whether there is a probability of confusion between similar names. If there is any possibility of such confusion in the case of medicines public policy requires that the use of the confusingly similar

name be enjoined." (253 F.2d at 393–394)

### Priority of Use

Since defendant began national marketing of its Vagestrol product on September 2, 1969, three weeks before Syntex commenced national distribution of its own Vagitrol cream, defendant contends that plaintiff is a "junior user," not entitled to protection against defendant's use of the Vagestrol mark, unless it derives trademark rights from Reid-Provident Laboratories.[6] Defendant further contends that no such rights were ever derived, because of certain defects in the agreement of April 10, 1969, purporting to transfer to plaintiff Syntex all of Reid-Provident's right, title and interest in the Vagitrol mark and product. More particularly, defendant argues that the agreement is ineffective in that Reid-Provident's good will was never transferred, that the agreement includes a bare license back to Reid-Provident to manufacture and market the trademarked product without control by Syntex, and that one of its provisions constitutes a *per se* violation of the antitrust laws.

The various technical rules connected with the assignment of trademarks to which defendant appeals were not evolved for the purpose of invalidating all trademark assignments which do not satisfy a stereotyped set of formalities. Their central purpose is protection against consumer confusion, Pepsico, Inc. v. Grapette Co., 416 F.2d 285, 288 (8th Cir. 1969), and it is in light of that goal that they are to be interpreted and applied.

The April 10 agreement between Syntex and Reid-Provident "assigns unto Syntex, its assigns and/or successors, all right, title and interest in and to the trademark VAGITROL and the registra-

---

6. Since we find that the agreement of April 10, 1969, was effective to transfer to Syntex trademark rights in the Vagitrol mark antedating any possible claim by defendant to the word Vagestrol, we do not discuss the disagreement between the parties as to the date on which defendant "adopted" the Vagestrol mark by a shipment of its product in interstate commerce.

tion thereof No. 770,263, together with the goodwill of the business symbolized by the mark." (¶2) Reid-Provident agreed to deliver to Syntex all technical information, know-how and data relating to the manufacturing and marketing of Vagitrol, and to refrain from use of the Vagitrol mark or any mark similar to it in connection with pharmaceutical or other products. (¶¶3, 2) As consideration Syntex agreed to pay a lump sum of $20,000 (half on the date of its market introduction of Vagitrol and half six months thereafter), plus a royalty scaled downward from ten cents per unit sold to three cents per unit for a period of five years. (¶¶4, 5) No royalty was to be paid on sales of any forms of the Vagitrol product other than the present cream form. (¶5) Reid-Provident in turn promised to refrain from manufacturing and/or selling any product similar to Vagitrol for a period of two years following the first sale of the product by Syntex (¶8) and retained, subject to certain notice provisions, the right to continue manufacturing Vagitrol cream until 120 days prior to the date of market introduction of the product by Syntex and the right to continue selling the product up to the date of marketing itself. (¶9) Finally, Syntex reserved the right to cancel the agreement should outstanding agreements, lawsuits, claims or trademarks, particularly Norwich Parmacal's Vagestrol, prevent it from enjoying trademark rights to the Vagitrol name unhindered. (¶10)

 Defendant's first objection to the agreement is that no good will was transferred along with title to the Vagitrol mark. Title 15 U.S.C. § 1060 provides that

"A registered mark or a mark for which application to register has been filed shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark. * * *"

The reason for this rule is the need, if consumers are not to be misled as a result of established associations with the mark, that the mark continue to be associated with the same or closely similar products after its assignment. Purity Cheese Co. v. Frank Ryser Co., 153 F.2d 88, 90 (7th Cir. 1946). In this case the products of assignor and assignee are identical. To be sure, Syntex took over no inventory or manufacturing facilities from Reid-Provident. Neither of these, however, was necessary for completion of a bona fide transfer to Syntex of "that part of the goodwill of the business connected with the use of" the mark. There is no patent on the Vagitrol formula, and its method of production is not secret. Syntex did receive certain technical information and know-how relating to the formulation and manufacture of the Vagitrol product. The only remaining information that Reid-Provident had, apart from trademark rights in the Vagitrol name itself, of any value to Syntex or to any other drug manufacturer desiring to take over Reid-Provident's Vagitrol business, were customer lists. It appears that what was actually turned over were back-order lists rather than complete customer lists. We do not think, however, given the magnitude of Syntex's national sales force (over 200 detail men) and its intent to promote and market the Vagitrol product on a far wider scale than had been attempted by Reid-Provident, that failure to turn over complete lists amounts to failure to transfer "that part of the goodwill of the business connected with the use of" the Vagitrol mark within the meaning of § 1060. Nothing relevant to possible consumer confusion or to Syntex's complete take-over of the production and marketing of Vagitrol was withheld.

Defendant's second objection to the April 10 assignment is that it incorporates an invalid license back to Reid-Provident to manufacture and sell Vagitrol cream after the purported transfer of all rights in the mark to Syntex.

Whether this argument be construed as a misuse defense to plaintiff's attempt to enforce its rights in the Vagitrol mark, or as indicative of an incomplete transfer of rights in the mark, it is unconvincing. The contention is that Syntex's failure to supervise Reid-Provident's use of the mark on quantities of Vagitrol cream sold between the date of the agreement and the commencement of Syntex's own marketing of the product rendered the authorization of that use in paragraph 9 of the agreement a "bare license in gross," and as such "a fraud upon the public and unlawful" under Second Circuit precedents. (See Def's brief at 33–34)

Undisputed evidence reveals that Syntex's responsibility to supervise the quality of the product sold by its licensee Reid-Provident was more than adequately satisfied. Reid-Provident continued, during the interim period in question, to be subject to the same FDA regulations governing manufacturing practices which had regulated it during its six previous years of manufacture, and which would regulate Syntex itself as soon as it began manufacture on its own. Furthermore, Reid-Provident was no newcomer. It was experienced in the manufacture of the product, and Syntex had inspected Reid-Provident's product and its manufacturing and quality-control procedures during the period of negotiations leading up to the agreement of April 10. While neither of these constituted a guarantee of quality, they did give Syntex an adequate basis for the reasonable belief that the high quality of the Vagitrol product would be maintained. It has been held that reliance upon the integrity of a licensee is sufficient to fulfill the control requirement where a history of trouble-free manufacture provides a basis for such reliance. Land O'Lakes Creameries v. Oconomowoc Canning, 330 F.2d 667, 670 (7th Cir. 1964). Again, it should be emphasized that the purpose of the control requirement is to avoid the danger that the public may be deceived as to the quality of a product sold under a recognized name. Robinson Co. v. Plastics Research & Development Corp., 264 F. Supp. 852, 863 (W.D.Ark.1967). No such danger was realistically incurred by the terms of the agreement in this case.

Finally, defendant contends that paragraph 8 of the agreement, pursuant to which Reid-Provident agreed to refrain from manufacturing and/or selling any product similar to Vagitrol for a period of two years following the first sale of the product by Syntex, constitutes an unreasonable restraint of trade and a *per se* violation of the antitrust laws. While agreements not to compete have at times been used for the unlawful purpose of monopolizing a part of trade or commerce, Schine Chain Theatres v. United States, 334 U.S. 110, 119, 68 S.Ct. 947, 92 L.Ed. 1245 (1948), it is hornbook law that a covenant not to compete ancillary to the sale of a business (or a part of a business), when reasonably limited as to time and territory, does not fall within the prohibitions of the Sherman Act. The question in every case is whether the restraint is reasonably calculated to protect the legitimate interests of the purchaser in what he has purchased, or whether it goes so far beyond what is necessary as to provide a basis for the inference that its real purpose is the fostering of monopoly. Goldberg v. Tri-States Theatre Corp., 126 F.2d 26, 32 (8th Cir. 1942).

In this case defendant points out that since a valid trademark provides protection only against competitive uses of the mark, rather than against competitive goods differently marked the provision that Reid-Provident may not market a similar formulation even under a generic or other trade name is unreasonable. (Def's brief at 34) While the restriction might indeed have been more narrowly drawn, as drawn it is not unreasonable. Syntex did not purchase the Vagitrol name alone—as defendant itself vigorously contends, Syntex could not legally have done so. What it bought was more nearly Reid-Provident's business in the Vagitrol product.

It was not unreasonable for Syntex, in attempting to give itself breathing space to build up its own business in the product, to insure against the possibility that Reid-Provident might relabel the product, circularize its old customers to advise them of the change, and attempt to continue its business much as before. The two-year term of the restraint seems unexceptionable.

Nor was Syntex's decision to market Vagitrol at a price higher than Reid-Provident's and exactly equal to that charged by the National Drug Company for AVC cream, Vagitrol's chief competitor, indicative of any monopolistic intent underlying paragraph 8 of the April 10 agreement. Syntex had, after all, to pay a 10 cents per tube royalty to Reid-Provident on any Vagitrol it sold during the first two years, and may well have had higher overhead (particularly research) costs to contend with.

We conclude, therefore, that the April 10, 1969, agreement between Reid-Provident and Syntex was effective to transfer to Syntex trademark rights in the Vagitrol mark antedating any possible claims by defendant to the word Vagestrol.

*Relief*

 We conclude that while an issue of fact as to the likelihood of confusion is raised, which precludes summary judgment, plaintiff has made a strong showing of the likelihood of success at trial on this and all other material issues.

Turning to the hardship that would result from denial or granting of preliminary injunctive relief, we do not find that the balance tips in favor of the defendant. If relief is denied, plaintiff faces the very real risk of product liability suits by patients who become the vic-

tims of mistaken substitutions of defendant's product in cases where plaintiff's product was prescribed. In addition there is the risk that physicians, rather than risk confusion on the part of pharmacists and patients, may decide to prescribe some other competing brand instead of plaintiff's Vagitrol. Furthermore, in balancing the risks and hardships perhaps the paramount consideration in this type of case should be the risk of harm to innocent third persons that would result if the wrong drug was prescribed or supplied by the pharmacist.

As against these risks defendant contends that an injunction would cause a substantial monetary loss because it will be compelled to recall and replace stocks bearing the name Vagestrol, and destroy labels, advertising and promotional material bearing that name. If defendant had not adopted and continued to use the name with full knowledge of its similarity to plaintiff's trademark and of the Patent Office adverse preliminary ruling, we might have been persuaded, but in choosing to continue in the teeth of this knowledge rather than adopt some other name defendant's predicament is of its own making.[7] See National Circle, Daughters of Isabella v. National Order of Daughters of Isabella, 270 F. 723, 734 (2d Cir. 1920). Furthermore, we would be prepared to grant a prompt trial on the remaining issues.

Plaintiff's motion for preliminary injunctive relief is granted and its motion for summary judgment is denied.

The foregoing shall constitute the court's findings of fact and conclusions of law in accordance with Rule 52(a), F.R.Civ.P.

Settle order.

---

7. We do not mean to imply, however, that defendant's conduct would warrant an accounting or the assessment of punitive damages.