[No. B183419. Second Dist., Div. Eight. Nov. 17, 2006.]

RITA ISKENDERIAN, Plaintiff and Appellant, v.
HAYGAN ISKENDERIAN et al., Defendants and Respondents.

**COUNSEL**

Mitchell, Silberberg & Knupp, Peter B. Gelblum, Douglas Bordewieck and Valentine Shalamitski for Plaintiff and Appellant.

Hart, Mieras & Morris, Tulane M. Peterson and Gary W. Morris for Defendants and Respondents.

**OPINION**

**BOLAND, J.—**

### SUMMARY

Following a bench trial, the court found that rights to the trademark "Zankou Chicken" were validly assigned to two trusts, and that the trusts properly and effectively directed the distribution of the trademark rights to the three adult children of the trustor. We affirm the trial court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

Rita Iskenderian brought a petition under Probate Code section 850, seeking a determination concerning the ownership of the trademark or trade name "Zankou Chicken."[1] She alleged that a trust created by her late mother-in-law, Markrid Iskenderian, purporting to distribute the rights to the trademark equally among her (Markrid's) three children, was ineffective because the trademark was not the property of the trust. She alleged her late husband Mardiros, Markrid's son, held all rights to the trademark at the time of his death, and she (Rita) is now the exclusive owner of the mark.

A bench trial elicited these facts. Vartkes and Markrid Iskenderian opened a chicken restaurant called Zankou Chicken in Beirut, Lebanon, many years ago. Vartkes and Markrid had three children: a son, Mardiros, and two daughters, Dzovig and Haygan. (We refer to members of the Iskenderian family by their first names for sake of clarity.) In the early 1980's, the Iskenderians (Vartkes, Markrid, Mardiros and Rita) emigrated from Lebanon to the United States, and Dzovig and Haygan eventually joined them.

When they came to the United States, the family opened the first Zankou Chicken restaurant in Hollywood (dubbed by the family as Zankou #2 in honor of the original restaurant in Beirut). The business filed taxes as a father-son partnership from 1984 to 1991, the father with a 60 percent interest and the son with a 40 percent interest. No written partnership agreement existed. The mother, Markrid, who created the garlic sauce for which Zankou Chicken is known, worked in the Hollywood restaurant along with her husband and son. In April 1984, the father-son partnership registered the Zankou Chicken trademark with the State of California.

Mardiros wanted to expand the family business by opening restaurants in other locations, but his parents did not wish to do so. As a result, the father-son partnership was dissolved in September or October of 1991. According to the family accountant, Ara Baltazar, Vartkes paid his son Mardiros $40,000 for his share of the partnership. After the dissolution, the parents continued to operate the Hollywood restaurant, and Mardiros obtained his parents' blessing to open additional restaurants of his own. Beginning in 1992, Mardiros opened Zankou #3 in Glendale, followed later by Zankou

---

[1] Section 850 allows an interested person to file a petition requesting the court to make an order in a case where a trustee is in possession of, or holds title to, property "and the property, or some interest, is claimed to belong to another," or where the trustee has a claim to property, title to or possession of which is held by another. (Prob. Code, § 850, subd. (a)(3)(A) & (B).)

Chicken restaurants in Van Nuys, Anaheim and Pasadena. Mardiros retained the profits from the additional restaurants, and his parents retained the profits from the Hollywood location. Vartkes died in 1992, and his widow, Markrid, continued to operate the Hollywood restaurant.

In September 1992, Mardiros applied to register the Zankou Chicken service mark in the United States Patent and Trademark Office, declaring in the application he was the owner of the mark and no other person had the right to use it. The mark was registered as of May 18, 1993. Baltazar testified Mardiros's mother was "very disturbed" when she later found out about Mardiros's action. The registration of the mark was canceled on December 23, 2000.

The Zankou Chicken enterprise continued to be operated cooperatively after the 1991 dissolution of the father-son partnership. Mardiros coordinated his operation of the newer locations with the Hollywood location operated by his mother. Logos and signage were consistent among all stores, with menus at one location listing contact information for all other Zankou locations. All the restaurants served the same basic fare, including the signature Zankou garlic sauce, which a single family member prepared at the Hollywood location and supplied to all the other Zankou restaurants. Mardiros's sister Dzovig worked as manager of Mardiros's Zankou #3 in Glendale. According to his widow Rita's "loyal but self-serving testimony," Mardiros developed various innovations and improvements that were also adopted at the Hollywood venue. All Zankou restaurants purchased chicken from the same source under the same contract.

After Vartkes's death in 1992, his wife, Markrid, created a living trust (1992 trust). She conveyed her sole ownership interest in the Hollywood restaurant to the trustees of the 1992 trust, the beneficiaries of which were her two daughters, Dzovig and Haygan. In 1993, she amended the beneficiaries to include her son, Mardiros, but still later, on August 30, 2000, amended the trust to benefit only Dzovig and Haygan. On the same date, she wrote and notarized a letter to Mardiros, explaining that he had reaped the benefits of his parents' fortune, that she had "passed on everything we have to you and have not considered much for your sisters," and that since he (Mardiros) had four Zankou Chicken stores of his own, she felt she should designate the Hollywood Zankou Chicken store for his sisters.

On February 11, 2002, Markrid created a second trust (2002 trust). The trustees of the 1992 trust (Markrid and Dzovig) assigned to the trustees of the 2002 trust "all of her right, title and interest in the restaurant business, the trade name, service mark, or trademark commonly known as *ZANKOU*

*CHICKEN*."[2] Markrid's 2002 trust provided for the distribution of specific gifts, including the Hollywood Zankou Chicken store to Dzovig and Haygan, and "[a]ll rights to the trademark/trade name 'Zankou Chicken' [to] be divided equally among [Mardiros, Dzovig and Haygan], share and share alike."

Meanwhile, the Zankou Chicken enterprise continued in the fashion described above for more than a decade after Vartkes's death, until tragedy struck in 2003. Mardiros, who had been diagnosed with cancer in 2001, shot and killed his mother, Markrid, his sister Dzovig, and himself on January 14, 2003.

On August 1, 2003, Mardiros's widow, Rita, filed a petition asserting her exclusive ownership of the Zankou Chicken mark. Rita alleged both Haygan (Mardiros's surviving sister) and Dzovig's sons (who succeeded to Dzovig's interest as a beneficiary of the 2002 trust) agreed that Rita owned the mark. She sought an order determining the mark was not property of the 2002 trust and directing the trustee to execute a quitclaim of the Zankou Chicken mark to her. Haygan and Dzovig's sons opposed the petition.

At the bench trial, Rita testified that after the father-son partnership was dissolved in 1991, her husband, Mardiros, told her that he "gave away" the Hollywood restaurant to his parents in return for exclusive rights to the Zankou Chicken trademark. The trial court did not believe Rita, observing that her testimony was "indistinct and self-serving," and no other evidence existed to support her claim Mardiros and his parents made an "exclusive trademark deal," which was "illogical and improbable" and "unseen and unheard by any witness." Further, the court stated: "And why would parents who had devoted their lives to building a business forfeit all their rights to the trademark embodying their lifelong work? The evidence suggested no sensible reason, and I conclude that none existed. The event did not occur."

The trial court found the 1991 dissolution of the father-son partnership was not a break or rupture in the business, and did not transfer exclusive business or trademark control from the parents to Mardiros, but rather "marked both a realignment of individuals' duties and the beginning of a successful expansion of a single successful family business." The evidence showed a "generally unified and cooperative family enterprise that operated cooperatively for decades" until the tragedy in 2003. The court concluded ownership of the mark Zankou Chicken remained "with the unified and cooperative family

---

[2] The assignment stated that Markrid was the owner of the business known as Zankou Chicken located in Hollywood, that she and her husband started the Zankou Chicken restaurant in the United States in 1983 and continuously used the name since its inception, and that it was "her intent that all three (3) of her children have an equal right to use said name in the future."

enterprise" on the day Markrid Iskenderian died. The court further found both trusts Markrid created were proper and she validly transferred her rights to the Zankou Chicken mark to the trusts. Consequently, the court gave effect to the provision in the 2002 trust stating that all rights to the Zankou Chicken mark were to be divided equally among Mardiros, Dzovig and Haygan.

Rita filed a timely appeal.

## DISCUSSION

■ Rita argues the trial court's order must be reversed because (1) the trademark was not an asset of the 2002 trust, (2) trademark law prohibits the joint ownership of a trademark, (3) the trust's transfer of the mark was an invalid "assignment in gross" because it was not accompanied by the goodwill of the business, and (4) the evidence showed Mardiros owned the trademark and his parents merely had an implied license from him to use the mark. We reject these contentions and affirm the trial court's order.

A. *The trademark was an asset of the 2002 trust.*

Rita asserts the trial court's finding that the "unified and cooperative family enterprise" owned the trademark was unsupported by any evidence. She says it is undisputed that until the father-son partnership dissolution in 1991, the father-son partnership owned the mark; thereafter, either Vartkes or Mardiros must have owned it, not the "family"; and the evidence showed Mardiros owned it. Rita's argument founders at several points. Most importantly, the court expressly found, as a matter of fact, that the mark was not transferred to Mardiros when the partnership was dissolved. Therefore, ownership of the mark either remained with the family enterprise (as the trial court described it) or with Vartkes alone (as the partner who retained the mark). In either case, on Vartkes's death, Markrid succeeded to his rights (and necessarily had community property rights of her own) in the mark, and had the authority to transfer those rights to the trust.

■ Rita resists the conclusion that Mardiros did not own the trademark by adamantly asserting no "unified family enterprise" existed after 1991. She claims no family enterprise could have existed because a joint enterprise requires the parties to it to share profits and losses, and Mardiros and his parents did not do so; the parents owned and retained the profits from the Hollywood store, and Mardiros owned and retained the profits from the four stores he opened. Rita is mistaken. We know of no rule requiring a joint enterprise to share profits and losses equally among each participant in the enterprise. A joint enterprise exists when there is " 'an agreement between the parties under which they have a community of interest, that is, a joint interest,

in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control.' . . . " (*Connor v. Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 863 [73 Cal.Rptr. 369, 447 P.2d 609], citation omitted.) The family plainly had "an understanding as to the sharing of profits and losses," namely that the parents would take the profits from Zankou #2 in Hollywood, and Mardiros would take the profits from the other stores he opened. Substantial evidence supported the trial court's implicit conclusion that all parties had a joint interest in and joint control of the Zankou Chicken enterprise as a whole, as well as an understanding as to profits and losses. No basis exists in law for reversing the trial court's finding of a unified family enterprise.[3] In short, a family or joint enterprise existed. Even in the absence of a joint enterprise, no legal basis exists for reversing the trial court's factual finding that Mardiros did not in any event obtain exclusive rights to the mark when the partnership dissolved.

Rita next asserts that the 2002 trust, as a matter of law, had no interest in the Zankou Chicken mark to transfer to anyone. She contends that even if Vartkes, rather than Mardiros, acquired the mark when the father-son partnership dissolved, "the undisputed evidence establishes that the trademark was not an asset of the 1992 Trust" (the trustees of which transferred it to the 2002 trust). For this proposition, Rita points to the fact that the schedule of assets for the 1992 trust lists only an assignment executed by Markrid, and the assignment merely conveys to the 1992 trust Markrid's interest in the Hollywood restaurant, without expressly mentioning the trademark. As to this, Rita is mistaken. A person's interest in a business she owns necessarily includes the goodwill of the business, and it is well settled that a trademark is merely a symbol of goodwill. "Good will and its trademark symbol are as inseparable as Siamese Twins who cannot be separated without death to both." (2 McCarthy on Trademarks and Unfair Competition (4th ed. 1992) § 18:2, p. 18-6 (release No. 38, Sept., 2006) (McCarthy).) To suggest that Markrid's transfer of the Hollywood restaurant to the 1992 trust did not include the goodwill in the restaurant—and necessarily the trademark that symbolizes that goodwill—is contrary to both common sense and the law. (See also 3 Callmann on Unfair Competition, Trademarks and Monopolies (4th ed., May 2003 update) § 20:63, p. 20-539 [because a trademark cannot be assigned without the goodwill to which it relates, a common law trademark "will follow an assignment of the goodwill and pass under a general conveyance of all the assets and effects of a business, even though it is not

---

[3] Rita asserts that, if the "family" owned the mark, the mother could not dispose of it through her trust because she was merely one of several owners. Even so, it would make no difference to Rita. Markrid clearly had an interest in the mark, and whatever interest she had was transferred to the trust and distributed as the trust specified. In either case, Rita does not have sole ownership of the mark.

specifically designated in the assignment"].) The trial court did not err in concluding Markrid validly transferred her interest in the Zankou mark to the 1992 trust.

B. *The trial court's order does not violate trademark law.*

Rita next asserts that, if this court concludes (as we do) that Rita is not the sole owner of the trademark, we should reverse the trial court's order with directions to conduct further proceedings to determine "which party should have exclusive ownership of the mark, because the law does not permit joint ownership of this trademark." She also asserts Markrid's transfer of the mark was "an unlawful assignment in gross." We disagree on both counts.

1. *Joint ownership of the mark is not unlawful.*

The law does not prohibit joint ownership of a trademark. Indeed, federal law expressly permits concurrent registrations of marks under certain circumstances, including when a court has finally determined that "more than one person is entitled to use the same or similar marks in commerce." (15 U.S.C. § 1052(d).) Rita correctly points out that scholarly authorities have suggested that multiple ownership of rights in a single mark "appears to be directly contrary to the basic definition of a mark as identifying and distinguishing a single seller's goods or services," and that "[i]f more than one unrelated person" is selling goods under the same mark, "such multiple, fragmented use can lead to customer confusion and deception." (2 McCarthy, *supra,* § 16:40, p. 16-64.3.) However, McCarthy also observes that, "[o]n the other hand, every other property right is capable of joint ownership by discrete entities," and that corporations, partnerships, joint ventures and marriages are combinations of individual persons. (*Ibid.*) The determination of trademark joint ownership issues should be resolved, McCarthy suggests, by a balancing of two policies. These policies are (1) the protection of customers, which "requires that fragmented, multiple ownership of marks be avoided and prohibited where likelihood of confusion exists," and (2) the contractual expectation policy, which requires that when parties create a contractual framework of joint ownership, "their legitimate expectations should be honored." (*Ibid.*) Thus, even the scholarly authorities do not suggest that three or more family members cannot jointly own a trademark. Indeed, McCarthy observes: "One method of balancing is to presume that the parties' contractual agreements will prevent confusion of customers. Such a presumption would rest on the assumption that it is in the best self-interests of the parties to avoid fragmentation of their trademark's image. In adopting

such a presumption, the Trademark Trial and Appeals Board stated: [¶] 'Considering . . . that the joint applicants [for trademark registration] here have a strong interest in protecting the validity and integrity of their marks . . . and presumably would not engage in activity detrimental to the long established rights therein; that confusion in trade would be inimical to their best interests; and that the agreement reflects a joint effort governing the use of their marks, including a viable effort to avoid confusion, . . . we can only conclude that confusion in trade is unlikely to occur.' " (*Ibid.*, quoting *In re Diamond Walnut Growers, Inc.* (T.T.A.B. 1979) 204 U.S.P.Q. 507, 511.) In this case, the policy of honoring the legitimate expectations of multiple family members owning the trademark would clearly outweigh any risk of customer confusion, as all members of the family "have a strong interest in protecting the validity and integrity" of the Zankou Chicken mark, and "presumably would not engage in activity detrimental to" their rights in the mark. (2 McCarthy, *supra*, § 16:40, p. 16-64.3.)

In short, Rita's assertion that joint ownership of the mark is "expressly prohibit[ed]" by trademark law is mistaken. Accordingly, because joint ownership of a mark is not illegal, no basis exists for reversing the trial court's order and directing the court to determine "which party should have exclusive ownership of the mark . . . ." Any such proceeding would be, at best, premature. As the trial court concluded, despite the unhappiness within the Iskenderian family, no evidence was presented that the family's "continuing ability to operate Zankou Chicken as an integrated and successful business" has been affected. To be sure, the joint ownership of a trademark can raise difficult problems when joint owners refuse to cooperate.[4] However,

---

[4] Rita cites *Durango Herald, Inc. v. Riddle* (D.Colo. 1988) 719 F.Supp. 941, in which the district court enjoined both parties to a joint venture from further use of the joint venture's trademark after expiration of the joint venture. The parties could not agree on the expansion or extension of their joint venture agreement, and both rejected cross-offers to buy out their partnership interests in the venture. (*Id.* at p. 944.) One party then sued the other to enjoin his misappropriation of the joint venture's trademark. The court stated the joint venture had "an indivisible interest in its trademarks and consumer good will" (*id.* at p. 943), and both partners had reciprocal duties "not to use the primary asset of the . . . joint venture for their individual benefit in a manner which burdens or injures only the other party." (*Id.* at p. 945.) The court stated one trademark could not be used by two competitors in the same market, as the customer confusion that would necessarily result is contrary to the goals of trademark protection. (*Id.* at p. 951.) The court concluded: "The appropriate equitable approach in this case is to return the parties to equal advantage upon dissolution of the joint venture. . . . It is indeed unfortunate that elusive independent resolution of this dispute has forced the court to, in effect, extinguish a valuable asset produced by years of hard work, energy and investment of the parties." (*Id.* at p. 952.) *Durango* does not assist Rita. It does not suggest joint ownership of a mark by family members is illegal. Unlike *Durango*, the family enterprise has not dissolved merely because its originators have died; no evidence exists that family members succeeding to the mark will be unable to agree on terms for continuation of the business, or that any of them is using the mark "in a manner which burdens or injures" the others (*id.* at p. 945); and indeed no evidence exists the stores are presently competing with each other.

no evidence indicates Rita and the other family members with interests in the Zankou Chicken mark will be unable to agree on terms for the continuation of the family enterprise, or for a buyout of interests in the enterprise should they decide not to cooperate as they have in the past. (Cf. *March Madness Athletic Ass'n, L.L.C. v. Netfire* (N.D.Tex. 2003) 310 F.Supp.2d 786, 799–800 [Illinois High School Association and the NCAA, both of which had claimed exclusive rights to commercial uses of the term "March madness," eventually agreed to assign their rights to a jointly managed new entity which licensed back use of the term in relation to their respective basketball tournaments].)

### 2. *Markrid did not make an unlawful assignment in gross.*

■  Because a trademark is a symbol of goodwill, and has no independent significance apart from the goodwill it symbolizes, the law requires "that good will always go with the trademark . . . ." (2 McCarthy, *supra*, § 18:3.) Thus, "there are no rights in a trademark alone and . . . no rights can be transferred apart from the business with which the mark has been associated." (*Mister Donut of America, Inc. v. Mr. Donut, Inc.* (9th Cir. 1969) 418 F.2d 838, 842 (*Mister Donut*); 2 McCarthy, *supra*, § 18:2.) An attempt to assign or sell a trademark "divorced from its good will" is characterized as an "assignment in gross." (2 McCarthy, *supra*, § 18:3.) One court explains: "A trademark cannot be sold 'in gross,' that is, separately from the essential assets used to make the product or service that the trademark identifies. [Citations.] The discontinuity would be too great. The consumer would have no assurance that he was getting the same thing (more or less) in buying the product or service from its new maker." (*Green River Bottling Co. v. Green River Corp.* (7th Cir. 1993) 997 F.2d 359, 362.)

Rita contends the trust's distribution of the Hollywood restaurant to Dzovig and Haygan only, while transferring rights in the Zankou Chicken mark to all three of Markrid's children, constituted an unlawful assignment in gross, because it was "unaccompanied by a concurrent transfer of the good will of the entire business to which the mark pertains" (the trust having no interest in Mardiros's restaurants). Rita is incorrect again.[5] "It is not necessary that the

---

*Durango* demonstrates that the "appropriate equitable approach" depends on the circumstances of the case (*id.* at p. 952), and the result in *Durango*—extinguishment of the mark—is presumably undesirable to all parties in this case.

[5] Rita's argument is ironic, given her contention that when the father-son partnership was dissolved in 1991, Mardiros "gave up his interest in the Hollywood store in exchange for getting the trademark." If, as Rita contends, no trademark rights could be transferred apart from the "entire business to which the mark pertains," one could argue Mardiros obtained an unlawful assignment in gross in 1991 if he received the trademark without the Hollywood restaurant.

entire business or its tangible assets be transferred; it is the goodwill of the business that must accompany the mark." (*E. & J. Gallo Winery v. Gallo Cattle Co.* (9th Cir. 1992) 967 F.2d 1280, 1289.) Markrid's trust did not transfer the rights to the Zankou Chicken mark "apart from the business" with which it was associated (*Mister Donut, supra*, 418 F.2d at p. 842). The "[a]nti-assignment-in-gross rule" merely requires "that good will always go with the trademark . . . ." (2 McCarthy, *supra*, § 18:3, p. 18-8.) That is exactly what happened here. The trust assigned all Markrid's rights to the trademark—symbolizing the goodwill of the business—to her three children, two of whom also received her interest in the Hollywood restaurant, and the other already had his interest in the other four restaurants. No separation of the trademark from the goodwill it represents has occurred. "The law's requirement that good will always go with the trademark is a way of insuring that the assignee's use of the mark will not be deceptive, and will not break the continuity of the thing symbolized by the assigned mark." (2 McCarthy, *supra*, § 18:3, pp. 18-8 to 18-9.) The trust's assignment of trademark rights to Markrid's three children did not separate the trademark from the goodwill it represents, and does not result in a deceptive use of the mark by any of them. (See *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.* (S.D.N.Y. 1970) 315 F.Supp. 45, 54 ["[t]he various technical rules connected with the assignment of trademarks . . . were not evolved for the purpose of invalidating all trademark assignments which do not satisfy a stereotyped set of formalities"; the rules are to be interpreted and applied in light of their "central purpose" of protection against consumer confusion].) No unlawful assignment in gross occurred.

### C. *The evidence did not establish Mardiros owned the mark and impliedly licensed it to his parents.*

Rita's final argument is that the evidence at trial established Mardiros owned the Zankou trademark, and the conduct of the parties reflected an implied license running from Mardiros to the family members who operated the Hollywood restaurant. This argument depends upon the twin premises that (1) the trademark was not an asset of the 2002 trust, and (2) even if it was, its distribution by the trust was invalid as a matter of law. As evident from the discussion in parts A. and B., *ante*, we reject both premises. Accordingly, because the trial court's conclusion that the trademark rights were never transferred exclusively to Mardiros was consonant with the evidence, the court's order giving effect to the disposition of the rights to the Zankou Chicken mark in the 2002 trust must be affirmed.

## DISPOSITION

The order is affirmed. Respondents are to recover their costs on appeal.

Cooper, P. J., and Flier, J., concurred.