This Opinion is a
Precedent of the TTAB

Mailed: August 16, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
**Trademark Trial and Appeal Board**

————

*Central Garden & Pet Company*

*v.*

*Doskocil Manufacturing Company, Inc.*

————

Opposition No. 91188816
to Application No. 77474444
Counterclaims to cancel
Registration No. 3386521
Registration No. 3731833

Opposition No. 91190058
to Application No. 77549707

Petition for Cancellation No. 92050852
of Registration No. 3272965

————

Russell S. Burnside, Thomas B. Slocum (on the brief), Greenberg Dauber Epstein Tucker PC, for opposer.

Charlene M. Krogh, Gregory Tamkin (on the brief), Dorsey Whitney LLP, for applicant.

————

**Before Mermelstein, Bergsman, and Adlin, Administrative Trademark Judges.**

**Opinion by Mermelstein, Administrative Trademark Judge:**

Doskocil Manufacturing Company, Inc. ("Doskocil") owns a registration for the

mark DOGZILLA (in standard characters),[1] and applications for the marks

---

[1] Reg. No. 3272965, filed April 4, 2006, issued July 31, 2007; Trademark Act §§ 8 & 15 affidavits filed and accepted. (We note that Doskocil filed its Trademark Act § 15 affidavit during the pendency of this proceeding, submitting a declaration which included the required

(continued...)

Opposition No. 91188816
Opposition No. 91190058
Cancellation No. 92050852

PETZILLA (in standard characters)[2] and DOGZILLA and design, depicted as follows,[3] all for "dog toys" or "pet toys":



In these consolidated proceedings, Central Garden & Pet Company ("Central") opposes registration of Doskocil's applications and seeks cancellation of Doskocil's registration, alleging that confusion is likely in view of Central's previously-used and registered ZILLA marks.[4] Trademark Act § 2(d); 15 U.S.C. § 1052(d).

By its amended answer, Doskocil denied the salient allegations of the notice of opposition, raised affirmative defenses, and asserted counterclaims to cancel Central's two standard-character registrations for the mark ZILLA for "pet food; pet treats"[5] and for "vivariums, terrariums, . . . aquariums," and related equipment, as well as "pet food."[6] As the basis for its counterclaims, Doskocil alleged that the in-

representation that "there is no proceeding involving . . . rights [in the registration] pending and not disposed of either in the U.S. Patent and Trademark Office or in the courts.")

[2] App. No. 77549707, filed August 18, 2008, based on the allegation of a *bona fide* intent to use the mark in commerce.

[3] App. No. 77474444, filed May 14, 2008, based on the allegation of a *bona fide* intent to use the mark in commerce.

[4] Central also alleged that Doskocil's marks create a false association with and disparage Central. Complaint ¶ 11 (Feb. 11, 2009). This issue was not briefed, and we consider it waived. *General Mills Inc. v. Fage Dairy Processing Indus. SA*, 100 USPQ2d 1584, 1588 n.1 (TTAB 2011).

[5] Reg. No. 3731833, filed May 31, 2007, issued December 29, 2009.

[6] Reg. No. 3386521, issued February 19, 2008, based on an application filed December 7,

(continued...)

tent-to-use application underlying Central's '521 Registration was improperly assigned prior to the filing of a statement of use, Trademark Act § 10; 15 U.S.C. § 1060, and raised a hypothetical claim that the mark in Central's '833 Registration is likely to cause confusion with Doskocil's previously-used and registered standard-character DOGZILLA mark, Trademark Act § 2(d); 15 U.S.C. § 1052(d). Amended Answer; Dkt. # 24. In response, Central denied the essential allegations of Doskocil's counterclaims and asserted affirmative defenses of its own.[7] Answer to Counterclaim; Dkt. # 26.

## I.   Description of the Record

The record includes the pleadings and the file of each application or registration opposed or sought to be cancelled in these consolidated proceedings.[8] Trademark Rule 2.122(b)(1). Central opposes or seeks to cancel the following applications and registrations owned by Doskocil:

| Reg./App. No. | Mark | Goods | Filing Date | Reg. Date |
|---|---|---|---|---|
| 3272965 | DOGZILLA | • Dog toys (IC 28) | Apr. 4, 2006 | Jul. 31, 2007 |
| 77474444 | | • Dog toys (IC 28) | May 14, 2008 | N/A |

---

2005.

[7] Central's defenses were not argued in its brief, so we consider them waived. *General Mills*, 100 USPQ2d at 1588 n.1.

[8] In the typical case, a *plaintiff's* registrations are not considered part of the record by virtue of Trademark Rule 2.122(b)(1). That provision makes of record applications or registrations which are subject to the opposition or cancellation, *i.e.*, those belonging to the *defendant*. But in this case, each party is in the position of both plaintiff and defendant. Accordingly, each application or registration opposed or sought to be cancelled is of record pursuant to Trademark Rule 2.122(b)(1).

| Reg./App. No. | Mark | Goods | Filing Date | Reg. Date |
|---|---|---|---|---|
| 77549707 | PETZILLA | • Pet toys (IC 28) | Aug. 18, 2008 | N/A |

By way of its counterclaims, Doskocil seeks to cancel the following registrations

owned by Central:

| Reg./App. No. | Mark | Goods | Filing Date | Reg. Date |
|---|---|---|---|---|
| 3386521 | ZILLA | • Lights, heaters, water filters and water filtering units for vivariums, terrariums, and aquariums (IC 11)<br><br>• Vivariums, terrariums, and aquariums for small animals; accessories for vivariums, terrariums, and aquariums, namely, tanks and artificial landscapes, stands, canopies, covers, hoods, air stones, aquarium fish nets (IC 16)<br><br>• Decorative stones for vivariums, terrariums, and aquariums (IC 19) | Dec. 7, 2005 | Feb. 19, 2008 |
| 3731833 | ZILLA | • Pet food; Pet treats (IC 31) | May 31, 2007 | Dec. 29, 2009 |

The parties submitted the following evidence:

## A. Central's Evidence

### 1. Testimony

- Mark Cavanaugh, President of the Central Aquatics business unit. Dkt. # 61-62.

- Michael Trott, CFO of Central Aquatics business unit. Dkt. # 75.

- Gary William Sparks, VP of Sales of Central Aquatics business unit. Dkt. # 81.

- Mark Johnson, Executive VP of TFH Publications, Inc. Dkt. # 73, 78 (testified twice).

- Matthew Allen, Senior Brand Manager for Central Aquatics business unit. Dkt. # 65.

- Kenneth Goff, former VP of Marketing for All-Glass Aquarium Co., Inc. Dkt. # 71.

4

### 2. Notices of Reliance

- August 30, 2010: Notice of Reliance on USPTO records, discovery responses, and APPA National Pet Owners Survey[9] Dkt. # 19.

- August 31, 2011: Rebuttal Notice of Reliance on USPTO records and discovery responses. Dkt. # 49.

- December 2, 2011: Supplemental Notice of Reliance (submitted by stipulation) on web advertisement. Dkt. # 52.

## B. Doskocil's Evidence

### 1. Testimony

- Brad Kane, Doskocil's Vice-President of Marketing. Dkt # 89.

- Timothy Vokes, Doskocil's Exec. Vice-President of Sales and Marketing. Dkt. # 91.

- Sarah Julian, Doskocil's former Director of Communications. Dkt. # 92-93.

### 2. Notice of Reliance

- June 21, 2011: Notice of Reliance on USPTO records and discovery responses. Dkt. # 32-35, 40.

---

[9] Central relies on the APPA survey for the statistics it reports. Central Not. of Reliance ¶ 4 (Aug. 30, 2010). Doskocil objects to the survey as hearsay and lacking in foundation. Doskocil Br. at 33. As will be seen, we have no need to consider this evidence. But to be clear, Doskocil's objections are well-founded. Central cites Trademark Rule 2.122(e) in its notice of reliance, although it is far from clear that this survey is a "printed publication" within the meaning of that rule. But even if it were a printed publication, unless a hearsay exception applies, it is admissible only for what it shows on its face, *i.e.*, as evidence that such a thing was published. Generally speaking, a printed publication cannot be used to prove the truth of any matter asserted in it. *Life Zone Inc. v. Middleman Group Inc.*, 87 USPQ2d 1953, 1954 n.5 (TTAB 2008) (citing *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1717 n.2 (TTAB 2007)). Moreover, a survey cannot normally be submitted in evidence without the foundational testimony (and an opportunity for cross-examination) of the expert who designed and directed the survey and drew the reported conclusions. Central argues that Doskocil itself uses the APPA survey in its business, Central Reply Br. at 12 (citing Julian Test. 157), but that has nothing to do with the survey's admissibility in evidence in this proceeding. A party's out-of-court use of a survey for some purposes is not a waiver of any objection to its admission as evidence.

5

Both parties raised objections to evidence proffered by the other. We consider those objections only to the extent necessary in this opinion.

## II. Background

### A. Central

Central Garden and Pet Co., Inc. owns a number of companies in the pet and garden business. One of Central's companies is Central Garden & Pet Distribution Group, which distributes a full line of pet-related goods bearing both Central and other brand identifiers or marks. Johnson Test. (2d) at 4-5. The Distribution Group has "a pretty extensive relationship" with Doskocil, distributing a number of Doskocil's products, *id.* at 8, including DOGZILLA dog toys.

Central also owns Pennington Seed, Inc., which in turn owns several subsidiary corporations. Trott Test. Exh. 50. In 2000 or 2001, Pennington Seed acquired All-Glass Aquarium Co., Inc., "[a] manufacturer of aquariums, terrarium lights and stands, [and] aquarium stands." Cavanaugh Test. at 102, 107. On December 7, 2005, All-Glass filed an application for registration of ZILLA, alleging a *bona fide* intent to use the mark in commerce on aquariums, terrariums, and several items of related equipment. On June 26, 2007, prior to filing an allegation of use, All-Glass assigned its application to Central, and on February 19, 2008, the USPTO issued the '521 Registration to Central. All-Glass continued in its business after the assignment, Cavanaugh Test. at 107-108, and still exists, doing business as Central

6

Aquatics.[10] *Id*. at 101; Allen Test. at 5-6.

Through its Central Aquatics business unit, Central uses the ZILLA mark on a line of equipment and supplies primarily for reptiles. Goff Test. at 25-26 ("anything that uses enclosure aquariums, water, mist, screen"); *id*. at 33 ("ZILLA is the umbrella brand for all the reptile products within Central Aquatics."). On May 31, 2007, Central itself filed an application to register ZILLA (for "pet food; pet treats"), and on December 29, 2009, Central received its second ZILLA registration.

### B. Doskocil

Doskocil Manufacturing Co., Inc. is a manufacturer of pet products. On April 4, 2006, Aspen Pet Products, Inc., an unrelated company, filed an intent-to-use application for DOGZILLA for dog toys. On February 19, 2007, Aspen filed a statement of use alleging first use and use in commerce as of February 9, 2007, and the '965 Registration issued to Aspen on July 31, 2007. In 2008, Aspen filed the '444 Application for DOGZILLA and design and the '707 Application for PETZILLA. On June 27, 2009, Aspen merged with Doskocil, with Doskocil surviving, and Doskocil acquired the '965 DOGZILLA registration, as well as the pending DOGZILLA and PETZILLA applications.[11] Assignment Reel/Frame 3569/0284.

Doskocil uses the DOGZILLA mark on dog chew toys. DOGZILLA products are

---

[10] Central does not consider Central Aquatics to be a separate business entity, but rather a trade name for the joint operations of several of Central's subsidiary corporations, including All-Glass. Trott Test. at 15.

[11] For the sake of simplicity, and because their provenance is irrelevant for our purposes, we will consider these applications and registration as if they had been originally filed by Doskocil.

sold through pet specialty shops like PetSmart, independent pet stores, and mass retailers, such as Wal-Mart. It also sells to Central Distribution Group, which distributes a number of Doskocil goods, including the DOGZILLA chew toy. Vokes Test. at 55-58, Exh. 128.

### III. Standing

To establish its standing, the plaintiff in a Board *inter partes* proceeding must prove that it is not a mere intermeddler, *i.e.*, that it has a real interest in the outcome of the proceeding and a reasonable basis for its belief that it would be damaged by issuance or maintenance of the defendant's registration. *See Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982); *Time Warner Entm't Co. v. Jones*, 65 USPQ2d 1650 (TTAB 2002).

In opposing Doskocil's applications and petitioning to cancel its registration, Central claims that confusion with Doskocil's marks is likely in view of Central's ZILLA registrations. As such, Central has adequately established its interest in this proceeding and a reasonable basis for its claim that damage would result from registration. For its part, Doskocil has standing to bring its counterclaims by virtue of its position as a defendant in Central's oppositions and cancellation. *E.g., Finanz St. Honore B.V. v. Johnson & Johnson*, 85 USPQ2d 1478, 1479 (TTAB 2007) (collecting cases).

### IV. Priority

A plaintiff must prove priority in a cancellation proceeding or in an opposition

8

where — as here — a counterclaim has been asserted against the plaintiff's registrations. *Massey Junior Coll., Inc. v. Fashion Inst. of Tech.*, 492 F.2d 1399, 181 USPQ 272, 275 n.6 (CCPA 1974) ("prior use need not be shown by a plaintiff relying on a registered mark unless the defendant counterclaims for cancellation"); *cf. King Candy Co. v. Eunice's King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974). Because this consolidated proceeding includes both a petition for cancellation and counterclaims for cancellation, each party in this case bears the burden of establishing its priority in connection with its claims of likelihood of confusion.

As a general matter, priority in a Trademark Act § 2(d) case goes to the party which made first use of its mark on the relevant goods.[12] *See* Trademark Act § 2(d) ("previously used . . . and not abandoned"). Use of a mark on the goods includes use in the ordinary course of trade, such as the sale or transport in commerce of goods bearing the mark. Trademark Act § 45. In addition, the Trademark Act provides that once a trademark is registered, the filing of the underlying application is considered to be "constructive use" of the now-registered mark on the identified goods.[13]

---

[12] This case involves only goods, although the same principles apply to services, as well. *See* Trademark Act § 3; 15 U.S.C. § 1053.

[13] Although the benefit of a constructive use date is not secured until registration, Trademark Act § 18; 15 U.S.C. § 1068, an applicant may still rely on constructive use in a Board proceeding. If the applicant would only prevail based on an unperfected constructive use date, the Board will issue a decision contingent on registration and allow the application in question to go forward. If and when a registration is issued, judgment in the new registrant's favor will be entered. *Zirco Corp. v. Am. Tel. & Tel. Co.*, 21 USPQ2d 1542, 1544 (TTAB 1991).

Trademark Act § 7(c); 15 U.S.C. § 1057(c). Thus any party may claim priority as of the date it first used the mark on the relevant goods (provided such mark was not abandoned), or, contingent upon registration, the date on which the party filed an application, whichever is earlier.

"The allegation in an application for registration, or in a registration, of a date of use is not evidence on behalf of the applicant or registrant; a date of use of a mark must be established by competent evidence." Trademark Rule 2.122(b)(2). While priority can be established through testimony or business records establishing the first use of the goods, "competent evidence" also includes either party's application or registration for the relevant mark, for when an application or registration is of record, the party may rely on the filing date of the application for registration, *i.e.*, its constructive use date. The result is that either party in this case may rely on the filing date of its various applications — without further proof — to establish priority.[14] *Syngenta Crop Protection Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1119 (TTAB 2009); *Brewski Beer Co. v. Brewski Bros. Inc.*, 47 USPQ2d 1281, 1284 (TTAB 1998) ("petitioner or respondent may rely on its registration for the limited purpose of proving that its mark was in use as of the application filing date").

---

[14] While constructive use might seem mainly a benefit to intent-to-use applicants (whose actual use date is usually later than their application filing date), it is frequently relied on in Board proceedings regardless of whether the mark was in use when the application was filed. Constructive use is simple and inexpensive to establish. Once the relevant application or registration is of record, the constructive use date is established and — unless priority depends on proving an earlier date — it is not necessary to establish a date of actual use, which usually requires testimony or other evidence.

Because of the multiple dates and arguments involved, it may be helpful to visualize the relevant events[15] in graphic form when considering priority:



## A. Constructive Use Priority

Although each party bears the burden of establishing its priority with respect to its likelihood of confusion claim, Central makes little mention of the issue in its opening brief. But like any party, Central is entitled to rely on the constructive use established by the December 7, 2005, filing date of the application for its '521 ZILLA Registration. That date is prior to any actual or constructive use claimed by Dos-

---

[15] The noted dates of first use for ZILLA and DOGZILLA are those dates alleged by the respective party. Doskocil disputes the date alleged for Central's first use of the ZILLA mark, but as will be seen, it is unnecessary to resolve that issue.

kocil, appearing to establish Central's priority. However, Doskocil asserts a counterclaim seeking cancellation of Central's '521 Registration, and if the '521 Registration is cancelled, the constructive use date it establishes dies with it, because a cancelled registration is not entitled to the benefit of Trademark Act § 7(c). *Cf. Anderson, Clayton & Co. v. Krier*, 478 F.2d 1246, 178 USPQ 46, 47 (CCPA 1973) (expired registration not entitled to § 7(b) presumptions); *In re Hunter Publ'g Co.*, 204 USPQ 957, 963 (TTAB 1979) (same).

Even if Central's '521 Registration is cancelled, Central may still rely on its actual use of the ZILLA mark (or that of its predecessor, All-Glass) in support of its likelihood of confusion claims. In its opening brief, Central notes in passing All-Glass' use of ZILLA in commerce as of September 25, 2006. Central Br. at 7 (citing Trott Test. at 17-18). The parties spent considerable effort during trial and briefing arguing over this date,[16] but as Doskocil recognizes, Doskocil Br. at 36 n.17, the dispute is meaningless with regard to priority, because All-Glass' September 2006 actual use was subsequent to the constructive use Doskocil is entitled to by virtue of the April 4, 2006, filing date of the application which resulted in its '965 Registration.

Central objects to Doskocil's reliance on the constructive use date of the '965 Registration because Doskocil's motion seeking leave to assert this counterclaim

---

[16] Doskocil argues that the mark which Central used on September 25, 2006, was R-ZILLA, rather than ZILLA, and that Central did not begin using ZILLA until May 2007. Doskocil Br. at 10-11. *But see* Central Reply Br. at 27-30.

focused on Doskocil's alleged date of actual use (February 2007), rather than its April 2006 constructive use date. Central Reply Br. at 35-36. However Doskocil's motion to amend may be characterized, Doskocil's amended pleading was not so limited. In addition to reciting its November 17, 2006, date of actual use, Doskocil clearly pleaded the filing date of the application upon which its '965 Registration was based, Amended Answer & Counterclaim ¶ 7; Dkt. # 24, and Doskocil alleged that it had priority based on both use *and* its registration, *id.* at ¶ 12 ("Registration No. 3731833 must be cancelled because [Doskocil's] use of its DOGZILLA mark *and '291 Application for the mark DOGZILLA* predates the filing date of Opposer's '833 Registration and Opposer's first use date for its ZILLA mark." (emphasis added)).

That the owner of an application or registration may rely on its filing date for priority should come as absolutely no surprise to a Board litigant; the constructive use accorded an application filing date is simply a benefit which flows from owner- ship of a registration, Trademark Act § 7(c), and is frequently used in Board pro- ceedings whether the underlying application was based on use or an intent to use, and once the relevant application or registration is made of record, nothing more need be proven to claim a constructive use date. *See Media Online, Inc. v. El Clas- ificado Inc.*, 88 USPQ2d 1285, 1288 (TTAB 2008) ("There can be no unfair surprise to petitioner merely because respondent did not allege priority of use as an affirma- tive defense. . . . Respondent is relying on nothing more than the filing date of the application that resulted in its registration, a date readily apparent to petitioner from the commencement of the proceeding."). The filing date of Doskocil's '965 Reg-

13

istration is a matter of public record, and has been since prior to the commencement of this proceeding. Thus, Central clearly was on notice of Doskocil's constructive use date, and its objections to Doskocil's reliance on constructive use are unfounded.

**B. Analogous Use Priority**

One more topic bears discussion on the issue of priority: Central argued at oral hearing that it is entitled to priority based on its use of ZILLA in advertisements and in a survey prior to either its application filing date or its date of first use of the mark on the identified goods.[17]

Nonetheless, nowhere in Central's various pleadings did it indicate its reliance on any priority date prior to its asserted September 26, 2006, date of first use, or otherwise set out the facts constituting such a claim. *E.g.*, Not. of Opp. ¶ 2 ('816 & '058 Oppositions); Pet. for Canc. ¶ 2; Answer to Countercl. ¶ 9 (Oct. 8, 2010). Because reliance on priority through analogous use must be pleaded, *see Fair Indigo LLC v. Style Conscience*, 85 USPQ2d 1536, 1537-38 (TTAB 2007) (sufficiency of analogous use pleading), Central's argument can only be considered if we find that the issue has been tried by implied consent (there was clearly no express consent). Fed. R. Civ. P. 15(b)(2). In this regard, Central introduced evidence during trial of its alleged use of ZILLA (other than as a trademark) prior to September 26, 2006. Central's witnesses Gary Sparks, Kenneth Goff, and Mark Cavanaugh all testified

---

[17] While Central's argument is not well-articulated in its briefs, Central does discuss, for instance, its alleged use of the ZILLA mark "in the months leading up to the September 2006 full launch of the "ZILLA" product line." Central Br. at 6.

to Central's use of ZILLA in connection with the "teaser" ad and Central introduced its "name validation study" (this evidence is discussed below), without objection from Doskocil on the ground that the evidence was irrelevant or supported an unpleaded theory. While the question is a very close one we find that the issue was tried by implied consent, and we therefore consider Central's analogous use theory.[18]

In general, the Trademark Act defines "use" of a trademark as the sale or transport in commerce of goods bearing the mark. Trademark Act § 45; 15 U.S.C. § 1127. While such use (sometimes called "technical" trademark use) is required to support an application for registration, a party may establish priority in a proceeding based on "analogous use," *i.e.*, any non-technical use of a mark which is sufficient to create in the mind of the relevant public an association between the goods and their source. *See generally*, 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 16:14 (4th ed. updated March 2013) (*hereinafter* MCCARTHY). Thus, even before proper trademark use commences, advertising or similar pre-sale activities may establish priority if they create the necessary association in the mind of the consumer.

But not all use of a trademark will be sufficient to establish priority by analogous use:

> Before a prior use becomes an analogous use sufficient to

---

[18] As will be seen, the result would be no different if we found otherwise and declined to entertain Central's arguments.

> create proprietary rights, the petitioner must show prior use sufficient to create an association in the minds of the purchasing public between the mark and the petitioner's goods. *Malcolm Nicol & Co. v. Witco Corp.*, 881 F.2d 1063, 11 USPQ2d 1638, 1639 (Fed. Cir. 1989). A showing of analogous use does not require direct proof of an association in the public mind. *T.A.B. Sys. v. Pactel Teletrac*, 77 F.3d 1372, 37 USPQ2d 1879, 1882 (Fed. Cir. 1996). Nevertheless, the activities claimed to create such an association must reasonably be expected to have a substantial impact on the purchasing public before a later user acquires proprietary rights in a mark. *Id.*

*Herbko Int'l Inc. v. Kappa Books Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002). Although the standard has been stated variously as requiring "open and notorious public use," of the mark, *Computer Food Stores, Inc. v. Corner Store Franchises, Inc.*, 176 USPQ 535, 538 (TTAB 1973); a showing that the mark has been "popularized in the public mind as identifying the product of the user thereof," *Jim Dandy Co. v. Martha White Foods, Inc.*, 458 F.2d 1397, 173 USPQ 673, 674-75 (CCPA 1972) (quoting Board opinion); "[p]rior public identification of" the user with its mark with reference to the goods or services, *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 19 USPQ2d 1424, 1429 (Fed. Cir. 1991); or that the mark was "used . . . in a way that created in the minds of people the necessary association between [the mark] and the" goods, *Malcolm Nicol & Co. v. Witco Corp.*, 881 F.2d 1063, 11 USPQ2d 1638, 1640 (Fed. Cir. 1989), the touchstone of analogous use is a factual determination of whether the use of the mark has created in the minds of the relevant public an association between the goods or services and

16

their source.[19] Simply put, to claim priority based on analogous use, a party must show that its putative mark essentially functioned as a trademark — identifying the source of the goods[20] in the mind of the consumer — notwithstanding that technical trademark use, such as use on or in connection with the goods, had not commenced. While this connection may be shown by indirect evidence, such evidence must adequately "support[] the critical inference of identification in the mind of the consuming public." *T.A.B. Sys. v. PacTel Teletrac*, 77 F.3d 1372, 37 USPQ2d 1879, 1881 (Fed. Cir. 1996).

Central suggests that its ZILLA "teaser" advertisement and its "use" of the term ZILLA in a survey establish its priority prior to the filing date of Doskocil's '965 Registration. Central Br. at 5-6. We disagree.

The survey, conducted by a third party, was a "Name Validation Study," Doskocil Not. of Reliance, Exh. Q, Dkt. # 40, dated March 1, 2006, commissioned by Central when it was considering the branding for what became its ZILLA product

---

[19] Some cases add that in order to claim rights under the analogous use doctrine, the early user must have made actual use of the trademark in commerce "soon enough after the initial advertising campaign to preclude a finding that the advertising was merely an attempt to preempt a mark for use at an indefinite future date." *Evans Chemetics, Inc. v. Chemetics Int'l Ltd.*, 207 USPQ 695, 700 (TTAB 1980). The parties have not argued this issue, and we need not address it.

[20] Note however, that while the function of a trademark is to identify the source of goods or services in commerce, it is not necessary that purchasers know the *identity* of the source. *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc.*, 221 F.2d 464, 105 USPQ 160, 162 (2d Cir. 1955) ("it matters not whether the customers know just who is the source").

line.[21] Eighty-three "reptile owners and enthusiasts" were asked for their impressions of or associations with four terms "Central [was] considering [as a trademark] for a new brand of reptile-related products." *Id.*

We are not persuaded that this "use" of ZILLA in the survey conducted for Central was sufficient to establish priority by analogous use. The "use" of a proposed mark in such a survey is not the type of use which would form the necessary connection in the mind of the public between the goods and their source. Surveys like this one are designed to assess the public's impression of a mark, not to form it, and there is no support for the notion that survey respondents would understand the appearance of a term in this type of survey to be a proprietary use. The record does not reveal exactly what these respondents were told, but if they knew the truth about the survey — that it sought to determine their perception of several possible marks — it is unlikely that the respondents would have associated ZILLA (or any of the other marks being tested) with a particular source for the goods, in part because the actual use of any one of them was merely a possibility. Survey respondents

---

[21] The study was submitted under seal, so we discuss it only in general terms. Nonetheless, it is hard to understand how Central can maintain that this information is confidential, yet at the same time rely on it in an attempt to establish the public perception of its mark for priority purposes.

We note that Doskocil did not object to this evidence, and correctly so. At least with respect to the analogous use issue, the significance of the name validation study is not that it allegedly proves the truth of any matter asserted in it. Rather, the study *itself* is alleged to constitute use of the ZILLA mark in such a way as to give rise to trademark rights. Unlike the APPA survey discussed above, *see supra* n.9, this evidence is admissible for this purpose because it is relied on to show that such a survey was conducted, rather than to prove the truth of its findings and conclusions.

would not have known which—if any—of the proposed marks was going to be used. *See Hydro-Dynamics Inc. v. George Putnam & Company Inc.*, 811 F.2d 1470, 1 USPQ2d 1772, 1774-75 (Fed. Cir. 1987) ("Subsequent adoption of the mark does not convert a shipment for the purpose of advisory consultation on the merits of a proposed trademark into bona fide use of the mark in commerce."). Given the small number of respondents involved (eighty-three), the vaguely-described goods ("reptile-related products"), and the nature of the "use" of ZILLA in the name validation study, Central's evidence falls far short of its burden to "support[] the critical inference of identification in the mind of the consuming public." *T.A.B. Sys.*, 37 USPQ2d at 1881.

We likewise conclude that Central's teaser ad fails to meet the standard for analogous use. Prior to its first sale of ZILLA products in September 2006, Central ran the following full-page advertisement in REPTILES magazine, Sparks Test., 26-28, Exh. 39, and possibly in other publications:



According to Central, "the ad featured a mysterious reptilian eye, ominously peering out of a large dinosaurian egg that is breaking open, with the 'ZILLA' logo prominently in the bottom right-hand corner, and the phrase 'The Reign Begins in

September' and . . . www.zilla-rules.com . . . in the bottom left-hand corner." Central Br. at 6.

The first problem with this evidence is the date. The application which became Doskocil's '965 Registration was filed on April 4, 2006, so if the teaser ad is to establish priority under the analogous use doctrine, Central would need evidence that this use of the ZILLA mark had already established a connection in the mind of the consumer between the goods and their source prior to that date. Yet Central's witnesses were vague in their testimony about the dates on which the teaser ad appeared,[22] and the magazines in which the advertisement ran. Goff Test. at 47 (ad ran in "some trade magazine several months before the product ever went to market"), *id*. at 49 ("It ran for one or two months before the ship date . . . [in] magazines, trade magazines like PET AGE, REPTILE, [*sic*] whatever, I don't know the names of them. If you told me the names, I could say yes, those were the names. . . ."), Sparks Test. at 25 (other than REPTILES, witness was "not sure" what periodicals ran the teaser ad).

The only actual copy of the teaser ad in the record is that which appeared in

---

[22] Central's counsel questioned Mr. Goff about the dates on which this ad was placed with the periodicals in which it ran. While Mr. Goff was not aware of the actual dates involved, he noted generally that a periodical's deadline for submitting advertising copy is typically some weeks prior to publication. Goff Test. at 49-50. This testimony was vague, far from certain, and in any event, irrelevant. We fail to see how simply *placing* an advertisement with a publisher's advertising department prior to publication would be sufficient to create any public perception of the mark. To the contrary, we think it obvious that the earliest date for considering the effect of an advertisement on the relevant group of consumers is the date on which the advertisement is published and available to them.

the September 2006 issue of REPTILES. Sparks Test. Exh. 39. While there is no evidence as to the exact date on which the September 2006 issue was published, there is absolutely no evidence to suggest that it was prior to April 4, 2006. Sparks Test. at 27 (estimating that the Reptiles ad ran "around the middle of August"). There is no testimony or other evidence of the particular dates on which any other copy of the teaser advertisement was published, much less whether such publications were sufficient to establish the necessary association in the mind of the consumer prior to April 4, 2006. While a party may establish priority by oral testimony alone, testimony which is uncertain or inconsistent is insufficient. *Powermatics, Inc. v. Globe Roofing Prods. Co., Inc.*, 341 F.2d 127, 144 USPQ 430, 432 (CCPA 1965).

But even if Central could establish that the teaser ad ran well-prior to Doskocil's filing date, this advertisement would not be sufficient to establish analogous use. The analogous use doctrine allows a party to claim priority as of when it is established that the mark is associated in the mind of the consumer with a source for the goods, or as of when we can infer that establishment from indirect evidence. Yet the teaser ad made no mention of *any* goods or services on or in connection with which Central was using or intended to use the mark. Central admits that the ad "did not show any specific 'ZILLA' product, but was intended to create excitement and interest in 'ZILLA' generally by being eye-catching and provocative." Central Br. at 5-6; Sparks Test. at 25; Goff Test. at 48-49.

While creating a sense of mystery and excitement before a product launch may be good marketing strategy, this type of advertisement cannot establish priority

because the essence of trademark rights is the use of a mark as an indication of the source of goods or services. The analogous use doctrine recognizes that this public perception of a mark as a source-indicator can sometimes be created by means other than "technical" use of a trademark, even before the mark is actually used on a product or service. But without being tied in some way to a good or service, such use could give rise only to a right in gross, and in this case, a right in gross prior to any trademark use at all.

Thus, even if we assume that the teaser ad created some "buzz" regarding the word ZILLA (and to be clear, the record does not indicate that the ad actually had that effect prior to the product launch), it could not have created any connection between the goods and their source in the mind of the public, because no goods were mentioned or depicted in it. At best, even if potential purchasers would have recognized the ad as showing the hatching of a lizard, that fact and Central's use of its ZILLA and lizard logo could have done no more than suggest that ZILLA was to be used as a trademark or service mark for something having to do with reptiles. As Central's own witness testified, this advertisement was intended to make the customer think "[s]omething's coming, but I'm not sure what it is." Sparks Test. at 25. The indefinite association of a mark with a general field of commerce is an insufficient basis from which we may infer the necessary association between the mark, the goods, and a source in the mind of the consumer.

In sum, the record supports neither a finding that the teaser ad was published prior to Doskocil's filing date, nor the conclusion that the ad created the necessary

23

association about the source of the goods in the mind of the public. Accordingly, we find that Central is not entitled to priority based on analogous use.

Therefore, with respect to priority, we conclude that if Doskocil's counterclaim to cancel Central's '521 Registration is successful, Doskocil has priority of use. But if the '521 Registration survives, it establishes Central's priority over Doskocil.

## V.   Assignment of the '521 Registration

We begin our discussion on the merits of the substantive claims and counterclaims with consideration of Doskocil's counterclaims because these are asserted to cancel Central's registrations of record herein. As noted, in this case the issue of priority (a necessary element of Central's likelihood of confusion claims) turns on the success or failure of Doskocil's counterclaim to cancel Central's '521 Registration. Doskocil asserts two counterclaims. By its first counterclaim, Doskocil argues that Central's '521 Registration should be cancelled because the underlying application was improperly assigned prior to the filing of an allegation of use.

### A.  Applicable Law

Doskocil bases its claim on the following statutory language:

> [N]o application to register a mark under section 1051(b) of this title shall be assignable prior to the filing of an amendment under section 1051(c) of this title to bring the application into conformity with section 1051(a) of this title or the filing of the verified statement of use under section 1051(d) of this title, except for an assignment to a successor to the business of the applicant, or portion thereof, to which the mark pertains, if that business is ongoing and existing.

Trademark Act § 10(a)(1); 15 U.S.C. § 1060(a)(1).

In other words, prior to the filing of an allegation of use,[23] an intent-to-use applicant may not transfer its application to another, unless the assignee also acquires at least that part of applicant's business to which the mark pertains. Although the statute does not explicitly state the consequence of a prohibited transfer of an intent-to-use application, the Board has previously held that an improper assignment results in a void application, and any resulting registration must be cancelled. *Clorox Co. v. Chem. Bank*, 40 USPQ2d 1098, 1106 n.8. (TTAB 1996).

### B. Analysis

There is no significant disagreement over the facts relevant to this issue. The application which ultimately issued as Central's '521 Registration was filed by All-Glass Aquarium Co., a wholly-owned subsidiary of Pennington Seed. Pennington Seed was in turn a wholly-owned subsidiary of Central. On June 26, 2007, while the application was pending — and prior to filing an allegation of use — All-Glass assigned the application in question to Central. The substantive portions of the assignment are as follows:

> NOW THEREFORE, in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged;
>
> ASSIGNOR agrees to sell, assign, transfer and convey,

---

[23] An intent-to-use applicant must demonstrate use of the mark in commerce before a registration will be granted. Such a showing is commonly called an "amendment to allege use" if filed prior to publication, *see* Trademark Act § 1(c), or a "statement of use" when filed after, *see* Trademark Act § 1(d). The difference is not important for our purposes, and we refer to both generally as an "allegation of use."

25

> and by this instrument hereby sells, assigns, transfers and conveys to ASSIGNEE, its successors, legal representatives and assigns, ASSIGNORS' [*sic*] entire right, title and interest in and to the Mark and the goodwill of the business appurtenant to and connected with the Mark, all rights at common law in the Mark, and ASSIGNOR further assigns, transfers, sells and conveys to ASSIGNEE, its successors, legal representatives and assigns, the right to renew, protect, defend and enforce any and all rights to the Mark including the right to sue for past infringement, the right to enforce any and all trademark rights of ASSIGNOR and causes of action therefor, presently known or unknown and inuring to ASSIGNEE, and the right to recover all claims for damages or for compensation for past infringement arising out of any cause of action, whether presently known, unknown, accrued or to accrue.

The assignment was recorded in the USPTO, referencing All-Glass' pending application. Assignment Reel 3569, Frame 0284. After filing an allegation of use, the '521 Registration was eventually issued in Central's name.

The recorded assignment is apparently the entire agreement between All-Glass and Central regarding transfer of the application; Central did not proffer testimony or any other evidence that the assignment document was part of a larger transaction between the companies. Central does not dispute that the assignment transferred only the ZILLA mark and application, together with any associated goodwill, from All-Glass to Central. Cavanaugh Test. at 107. In particular, Central was not the successor to All-Glass or any part of it; All-Glass continued in the exact same business after the transfer as it had conducted previously, including the production

26

and sale of products under the ZILLA mark.[24] *Id.* at 110.

We have no doubt that the transfer from All-Glass to Central violated the literal terms of Trademark Act § 10. The application was in fact transferred prior to the filing of an allegation of use, and at argument, Central candidly admitted what appears obvious from the record — that the only thing which was exchanged in the transaction was the mark and "the goodwill of the business appurtenant to and connected with the Mark," in return for which All-Glass recited receipt of nominal consideration. In particular, neither All-Glass itself, nor the "portion thereof, to which the mark pertains," Trademark Act § 10(a)(1), was transferred from All-Glass to Central along with the ZILLA mark. Cavanaugh Test. at 110.

Nonetheless, Central argues that Doskocil's counterclaim runs counter to the purpose of Section 10, because "at the time of the assignment, Central . . . and All-Glass were closely related companies, and the assignment did not cause any confusion or discontinuity in the use of the 'ZILLA' mark." Central Reply Br. at 30-31. Central further contends that

> [t]he federal courts have long rejected the hypertechnical application of section 1060 urged by Doskocil. The statute expressly permits such early assignment from one company to its "successor." 15 U.S.C. § 1060(a)(1). When look-

---

[24] While an allegation of use had not yet been filed with the USPTO, it appears that the ZILLA mark was actually in commercial use by the time of the Central/All-Glass assignment. Although Doskocil disputes Central's date of use, it apparently agrees that the mark was in use by the time of the assignment from All-Glass to Central in late June 2007. *See* Doskocil Br. at 10-11. Nonetheless, the statute makes clear that assignments are restricted until the filing of an allegation of use with the USPTO. Whether the mark was actually in use at the time of assignment is not a factor. *See* Trademark Act § 10(a)(1).

> ing at whether the assignee is the "successor" of the as-
> signor, "'[i]t is not necessary that the entire business or
> its tangible assets be transferred; it is the goodwill of the
> business that must accompany the mark.'" *Iskenderian v.
> Iskenderian*, 51 Cal. Rptr. 3d 163, 171 (Cal. Dist. Ct. App.
> 2006) (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*,
> 967 F.2d 1280, 1289 (9th Cir. 1992)). Case law has held
> that the operative consideration is whether there is conti-
> nuity of the use of the mark, which is, in turn, evidenced
> when "the products or services being offered concurrently
> under the mark by the assignor and assignee were sub-
> stantially similar." *Glow Indus., Inc. v. Lopez*, 273 F.
> Supp. 2d 1095, 1111–12 (C.D. Cal. 2003).

*Id.* at 31.

The cases Central cites in the quoted passage state general principles applicable to assignments of registrations or use-based applications, but they are inapposite here. Unlike any of the cited cases, the assignment we now consider involves the transfer of an intent-to-use application, for which Congress set out the separate and specific requirement found in the second sentence of Trademark Act § 10(a)(1). Although trademarks and the applications and registrations based on them may as a general matter be freely assigned, along with the associated goodwill, the owner of an intent-to-use application, prior to the filing of an allegation of use, may assign the application only "to a successor to the business of the applicant, or portion thereof, to which the mark pertains." Trademark Act § 10(a)(1). The requirement applies even if the assignment would otherwise maintain continuity in the use of the mark and would not confuse or deceive consumers. While the parties to such an assignment need not recite any particular language, it is absolutely clear that an intent-to-use application may only be assigned to a successor to the assignor's busi-

28

ness or at least the relevant part of it.

Central argues that a "successor to the business of the applicant, or portion thereof, to which the mark pertains" includes one who succeeds merely to the goodwill associated with the assigned mark. Central Reply Br. at 31. That is clearly incorrect. *Any* transfer of a trademark must include the goodwill associated with the mark, because without goodwill, there is no trademark to transfer. *See generally* MCCARTHY § 2:15 (trademark cannot be separated from goodwill). The part of Trademark Act § 10(a)(1), pertaining specifically to assignments of intent-to-use applications, plainly requires more than that the assignee be the recipient of the goodwill associated with the mark or it would be superfluous. Whether one characterizes this as a "hypertechnical" reading of the law is irrelevant; it is the plain and clear meaning of the statute.

Central also cites the Board's decision in *Amazon Techs. v. Wax*, 95 USPQ2d 1865 (TTAB 2010). Central Reply Br. at 32. In *Amazon*, Wax and Freeland jointly filed an intent-to-use application. Prior to the filing of an allegation of use, Freeland assigned to Wax his "entire right, title, and interest, together with any goodwill symbolized by the mark." *Id.* at 1869-70. In an opposition to registration of Wax' application, Amazon argued that the transfer was not permissible under Trademark Act § 10, and that as a result, no registration should issue. On cross-motions for summary judgment, the Board disagreed, finding that

> there was no transfer to "another," as Mr. Wax was an original joint applicant and is now the sole remaining applicant. In fact, the "Trademark Assignment" in this case

29

> was more akin to a change in the type of entity which
> owned the application than to a traditional assignment of
> a mark from one unrelated party to another.

*Id.* at 1871. The result would likely have been the same in the unfortunate event that one of the joint applicants had died while the application was pending, or if the applicants were identified as a partnership[25] which loses a partner before filing an allegation of use. Although Freeland relinquished his rights to Wax, there was no assignment of the application under Trademark Act § 10.[26]

The facts of the case before us are different. In this case, All-Glass, a Wisconsin corporation and a distinct legal entity under the law, *see* Trademark Act § 45, filed the ZILLA application. All-Glass then assigned the mark and application to Central — a Delaware corporation, and a distinct and *different* legal entity — to whom the subject registration eventually issued. Unlike the case in *Amazon* where the application was never transferred from one entity to another, the assignment in this case clearly did so.

We have not forgotten that Central owned all of the stock in Pennington Seed,

---

[25] As noted in *Amazon*, "the term[] 'joint applicant' . . . reflects the relationship of multiple applicants as to a particular mark, but does not identify a particular type of legal entity." *Id.*, 95 USPQ2d at 1871 n.12 (quoting TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 803.03(d) (6th ed. 2010)). In fact, Wax and Freeland's relationship was almost surely a partnership under the applicable state law. *See* Uniform Partnership Act § 202(a) (1997) (unless a different business entity is formed under another statute, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership").

[26] The Board granted partial summary judgment to Wax. Following trial on the remaining issues, judgment was rendered for Amazon, and Wax appealed. The Court of Appeals affirmed without touching on the issue of Freeland's assignment. *Wax v. Amazon Techs., Inc.*, App. No. 2012-1494 (Fed. Cir. Jan. 14, 2013) (per curiam).

and that Pennington Seed owned all of the stock in All-Glass, which in turn owned the ZILLA application. In one sense, it could be said that Central owned the application all along. But the application was neither filed by Central nor by Pennington, Central's subsidiary; the application was filed by All-Glass, which was Pennington's subsidiary. Central chose to structure its business using multiple and separate corporate subsidiaries, each of which counts as a "person" under the Trademark Act. 15 U.S.C. § 1127, Trademark Act § 45 ("The term 'person' and any other word or term used to designate the applicant or other entitled to a benefit or privilege or rendered liable under the provisions of this Act includes . . . a . . . corporation. . . ."). Such a business structure may offer some advantages, but it also comes with some strictures, and the existence of a corporation cannot be turned on or off at will to suit the occasion. This result is merely the flip side of the principle that a parent corporation is not liable for the wrongs of its subsidiary absent disregard of corporate separateness, such as an "alter ego" relationship. *See generally A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593, 7 USPQ2d 1066, 1068 (Fed. Cir. 1988). Central purchased and maintained All-Glass as a separate corporation, and All-Glass, not Central, filed the ZILLA application, asserting that it had a *bona fide* intention to use the mark in commerce. We cannot ignore the fact that the intent-to-use application was transferred from one entity to another in a transaction that did not satisfy the requirements of the statute.

Central contends that in enacting Trademark Act § 10,[27] Congress did not intend to prohibit assignments such as the one at issue, citing the legislative history of the provision. Central does not, however, argue that the language of the statute is unclear as it applies to this case, and when a statute is clear on its face, it is usually inappropriate to delve into the legislative history in search of another meaning. *Park 'N Fly v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 224 USPQ 327, 329 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."); *In re District of Columbia*, 101 USPQ2d 1588 (TTAB 2012) ("if the statutory language is clear, our inquiry is usually at an end because Congress is presumed to have intended exactly what was enacted"). Central's resort to the legislative history is thus unpersuasive and inappropriate.

Even if considered, however, Central's legislative history arguments would not change the result in this case. Central argues that the anti-assignment provision of Trademark Act § 10 was intended to prevent trafficking in intent-to-use applications and that the Board has previously found that to have been Congress' motivation.[28] *Clorox*, 40 USPQ2d at 1004. While neither Central nor All-Glass was selling

---

[27] The anti-assignment clause of Trademark Act § 10(a)(1) was added to the Trademark Act by the Trademark Law Revision Act (TLRA), Pub. L. No. 100-667, 102 Stat. 3935 (1988), which amended the law to permit the filing of trademark applications based on an intent to use the mark in commerce. Minor refinements to Section 10 were added by later amendments.

[28] The Board appropriately considered legislative history in *Clorox* because the statute was silent as to the effect of a prohibited assignment. *Clorox*, 40 USPQ2d at 1104 ("Where, as

(continued...)

32

intent-to-use trademarks to the highest bidder, nor is there any evidence of bad intent,[29] it does not follow that either entity should be free from the restrictions of the statute. It is possible that Congress could have drafted this statutory provision more narrowly, in a way that would not have reached the assignment in this case, if that was indeed Congress' intention. But as we noted in a similar situation,

> [w]hile applicant might be of the opinion that Congress employed a larger hammer than necessary to hit that particular nail, we are not in the business of rewriting statutes to more narrowly effect what we suppose might have been Congress' intention. We must presume, of course, that Congress knew what it was doing when it drafted [the statute]. *United States v. Goldenberg,* 168 U.S. 95, 102–03 (1897). And if that statutory language is clear — as we find it to be in this case — there is a "strong presumption that the plain language of the statute[] expresses congressional intent [which] is rebutted only in rare and exceptional circumstances." *United States v. Clintwood Elkhorn Mining Co.,* 553 U.S. 1, 11 (2008).

*In re Houston,* 101 USPQ2d 1534, 1539 (TTAB 2012) (discussing Trademark Act § 2(b)). Needless to say, we have no authority to tell Congress *how* to accomplish its

---

here, the statute is silent, we must of necessity turn to the legislative history in an effort to discern the intent of Congress in prohibiting such assignments.").

[29] Whether Central and All-Glass entered into their transaction free of nefarious intent is irrelevant. In *Clorox,* an intent-to-use application was assigned to a creditor as security for a loan, with a license to the assignor and an agreement to transfer back upon repayment. The agreement included provisions maintaining the quality in the branded goods and continuity in the use of the mark. Although clearly not a pernicious scheme to profit from the sale of pre-use trademark applications — the parties intended only to secure financing for a loan — the parties' intentions were not a factor in the Board's decision to grant a petition for cancellation. *Clorox,* 40 USPQ2d at 1106 ("In violating, whether unwittingly or otherwise, the statutory provision against assignments of the kind which took place herein, respondent and its assignor engaged in the very trafficking in a mark (albeit for the purpose of providing security for a loan) which Congress plainly sought to prohibit in order to safeguard the intent-to-use system.").

goals and we cannot ignore the express language of the statute merely because it is arguably broader than necessary to address the specific concern that prompted consideration of the legislation.[30]

By its terms, Trademark Act § 10(a)(1) prohibits the assignment of an intent-to-use application prior to the filing of an allegation of use, unless the assignment is "to a successor to the business of the applicant, or portion thereof, to which the mark pertains." Although All-Glass assigned the ZILLA mark to Central prior to filing its statement of use, Central was not then, and is not now, the successor to any or all of All-Glass. After the assignment, All-Glass continued to produce ZILLA-branded products as it had previously done, and no part of All-Glass was transferred to Central. We conclude that the assignment of the ZILLA application from All-Glass to Central was contrary to the anti-assignment provision of Trademark Act § 10, and that Central's '521 Registration must therefore be cancelled.

## VI. Likelihood of Confusion

Doskocil's second counterclaim is a perfunctory claim that, should the Board find a likelihood of confusion in this case, Central's '833 Registration should be cancelled because Doskocil (rather than Central) has priority. Doskocil Br. at 47. But

---

[30] Central further argues that a legislative proposal which Congress did *not* adopt sheds light on the interpretation of Trademark Act § 10(a)(1). Central Reply Br. at 34. We disagree. The legislative proposal would not have applied to the facts at hand. And even if it would have, the record does not reveal whether Congress' failure to adopt it was because it was contrary to Congress' intent (as Central supposes), because Trademark Act § 10 already prohibited such transfers, or for some other reason, and we decline to speculate. In any event we need not (and therefore should not) rely on legislative history because the statute is clear.

notwithstanding its claim, Doskocil argues at length that it does *not* believe that confusion is likely to result from the parties' use of their marks, devoting a large part of its main Brief to a refutation of Central's arguments under the *du Pont* factors. Doskocil Br. at 12-35; Doskocil Reply Br. at 2-3. When it comes to its counterclaim for cancellation of Central's '833 Registration, Doskocil does not back away from its argument that confusion is not likely, instead casting the counterclaim as purely defensive:

> [*I*]*f* the Board finds a likelihood of confusion exists between the DOGZILLA marks and the ZILLA mark, *which it should not*, then this Board should cancel Central's ZILLA Registration Number 3731833 as Doskocil's constructive use date based on the filing date of its DOGZILLA word mark application pre-dates any use by Central. Of course, *consideration of this question should not be necessary as there is no likelihood of confusion between the relevant marks.*

Doskocil Br. at 5 (emphasis added).

As a result, we find it unnecessary to reach either party's claims of likelihood of confusion. On the one hand, Doskocil makes it abundantly clear that its Trademark Act § 2(d) counterclaim should be considered only in the event that we somehow find the likelihood of confusion which Doskocil does not believe to exist, and that Central would otherwise prevail. But Doskocil is the senior party, and if the senior party does not believe there to be a likelihood of confusion, we need not — and should not — opine on this purely hypothetical question.[31] And on the other hand,

---

[31] We have permitted a "hypothetical" pleading when an (arguably) senior plaintiff has been

(continued…)

we do not reach Central's claim that confusion is likely (or Doskocil's defenses to it), because without the constructive use established by its '521 Registration, Central does not have priority and cannot prevail.

With respect to likelihood of confusion, we therefore leave the parties as we found them, without reaching the merits of either party's claim.

## VII.  Conclusion

We have carefully considered all of the evidence and argument submitted by the parties, including that which we have not specifically discussed. For the foregoing reasons, we conclude that Central's Registration No. 3386521 was assigned contrary to Trademark Act § 10(a)(1), and must therefore be cancelled, and we dismiss both parties' claims of likelihood of confusion.

***Decision*:**

- Central's Opposition No. 91188816 to Application No. 77474444 is DISMISSED.

  o Doskocil's counterclaim to cancel Registration No. 3386521 is GRANTED, and Registration No. 3386521 will be cancelled in due course.

---

refused registration in view of the junior party's application or registration. In such a case, the plaintiff may argue both that there is no likelihood of confusion *and* that should the USPTO nonetheless find confusion likely, that it has priority and should prevail. *Home Juice Co. v. Runglin Cos. Inc.*, 231 USPQ 897, 899 (TTAB 1986) ("[A] hypothetical pleading of likelihood of confusion . . . is appropriate where a petitioner's standing is based on its inability to secure registration of its mark, albeit it is the senior user, because the registered mark has been cited as a reference by the Examining Attorney.").

But in this case, Doskocil does not allege that it has been refused registration in light of either ZILLA registration (both of Doskocil's applications were approved for publication), or any other harm allegedly resulting from ZILLA's trademarks. In fact, Doskocil is adamant that there is no such harm and that the parties' use of their respective marks is not likely to cause confusion. With Central's '521 Registration to be cancelled, establishing Doskocil's priority over Central's '833 Registration, there is no contested likelihood of confusion claim left to decide.

- o Doskocil's counterclaim to cancel Registration No. 3731833 is DISMISSED.

- Central's Opposition No. 91190058 to Application No. 77549707 is DISMISSED.

- Central's Petition to Cancel Registration No. 3272965 is DENIED.